9 P.3d 787 (2000)
141 Wash.2d 629
Leanne Gross PULCINO, Respondent,
v.
FEDERAL EXPRESS CORPORATION, a foreign corporation, Petitioner,
John Grauke, M.D., Jane Doe Grauke, and the marital community composed thereof, Defendants.
No. 68118-0.
Supreme Court of Washington, En Banc.
Argued January 27, 2000.
Decided September 14, 2000.
*790 Kaplan, Begy & Von Ohlen, Robert Von Ohlen, Chicago, IL, Colby S. Morgan, Jr., Paul D. Jones, Federal Express Corp., Memphis, TN, Jeffrey Charles Johnson, Seattle, for Petitioner.
Ellen M. Ryan, Seattle, for Respondent. *788
*789 IRELAND, J.
In this employment discrimination case, both parties sought discretionary review. Leanne Gross Pulcino claims that the lower courts failed to recognize that her disability discrimination claim was based upon Federal Express' (FedEx) failure to reasonably accommodate her during periods of temporary disability. We agree and thus reverse the summary judgment dismissal.
FedEx contends that Pulcino's union discrimination claim is preempted by the Railway Labor Act, 45 U.S.C. §§ 151-164, and, if not preempted, then is subject to dismissal because RCW 49.32.020 prohibits union discrimination only when it is based upon an employee's participation in specific, statutorily protected activities. We disagree and thus affirm the Court of Appeals' decision reversing a directed verdict.

FACTS
Leanne Gross Pulcino became a flight attendant for FedEx in 1989 when FedEx purchased Flying Tigers, a charter airline that transported military personnel. Although FedEx had previously been nonunion, it acquired 10 collective bargaining units with its purchase of Flying Tigers, including a unit of flight attendants. By early 1992, only the attendants' unit remained.
Within a week of the attendants' vote to retain their union, FedEx informed the attendants that due to military downsizing it *791 was laying off 250 of them. After the layoff, Pulcino sought a courier position, which she claims was available based upon listings in FedEx's career opportunity bulletins.
A FedEx manager told her, however, that the only position currently open was a part-time handler position, which involved stacking items on pallets and pushing pallets that could weigh up to 2,000 pounds into trucks. Pulcino's supervisors later admitted that there was a courier position open, but, according to the information they received, Pulcino was ineligible for such position and was supposed to be placed in a handler position.
According to FedEx, its treatment of the attendants was in accordance with their union contract, which allegedly required them to be considered equally with external candidates for any position at FedEx for which they were qualified. No such language appeared in the agreement. The agreement actually provided that covered employees would be considered "for other types of employment within the Company, if, in the opinion of the Company, they are properly qualified for such positions." Clerk's Papers (CP) at 784, 827.
Pulcino, who is 5'5" tall and weighed 120 pounds, claims that the handler position she was given involved "unusually heavy" work. CP at 840-843, 961. Her supervisor claimed, however, that all other positions within his supervision required heavier lifting.
After Pulcino started working as a handler, she had several meetings with management to determine why others with less seniority were being given the easier courier positions. During one such meeting, she observed that a supervisor had notes with an attached Post-It that said: "no JCATS, no three month review, Union Aff." (JCATS is FedEx's shorthand for their internal hiring process.) Report of Proceedings at 262-63. Pulcino claims the Post-It is evidence that she was not considered for a courier position because of her prior union affiliation.
Pulcino suffered a lower lumbar strain while working as a handler. When Pulcino's doctor subsequently restricted Pulcino to light duty, her supervisor placed her on an unpaid involuntary leave of absence because FedEx did not have any light duty positions for part-time employees.
A few weeks later, Pulcino's supervisor required Pulcino to see another doctor, who countermanded her own doctor's instructions and gave her a full release to return to work. Although Pulcino feared suffering more back pain, she returned to her regular duties because she was afraid FedEx would terminate her.
Pulcino asserts that her supervisors denied her repeated requests for a safety belt, promoted employees with less seniority ahead of her, harassed her for working too slowly and generally treated her "much more harshly" than other employees. CP at 887-88, 964.
After Pulcino returned to work, she suffered a rib strain and a broken foot. A doctor placed Pulcino in a cast and gave her a release to return to light duty work. Pulcino brought in her doctor's note but returned to the exact same work she had been doing.
Four weeks later, a manager told Pulcino that he just realized that she was restricted to light duty and again placed her on an unpaid involuntary leave of absence. A few months later, Pulcino's supervisor requested permission to fill Pulcino's position, stating that she was not expected to return to work and that he wanted her replacement to do "sort/shuttle" work. Report of Proceedings (RP) at 218. However, the supervisor had spoken to Pulcino's doctor and knew that Pulcino was expected to return soon. A few days later, Pulcino's doctor gave her a full medical release.
When Pulcino presented her medical release, her supervisor again told her that the only job he had available was her former handler position and that it involved lighter work than any of the other positions he supervised. Pulcino denies these statements claiming that her supervisor had just obtained permission to assign someone to a sort/shuttle position and that she had observed couriers on three different routes and found their work easier.
Based upon her prior bad experiences, Pulcino was unwilling to return to her former position. Thus, FedEx referred her to a leave of absence (LOA) manager who would *792 help her find another position. During this final leave of absence, the LOA manager informed Pulcino of only two part-time positions, both of which would have required her either to relocate or to commute a long distance. At the end of 90 days, FedEx terminated Pulcino because she had not found another position.
Following her termination, Pulcino filed a complaint alleging union discrimination in violation of public policy, and disability discrimination in violation of RCW 49.60.030. At a pre-trial hearing, the trial court dismissed Pulcino's disability discrimination claim and limited her union discrimination claim to wrongful discharge. It precluded Pulcino from referring to any evidence that preceded her employment as a handler and excluded all evidence of a corporate policy of antiunionism.
At the close of Pulcino's case on the wrongful discharge claim, the court granted FedEx's motion for a directed verdict. Pulcino appealed contending that the trial court improperly dismissed her disability discrimination claim and improperly limited her union discrimination claim to wrongful discharge. Pulcino v. Federal Express Corp., 94 Wash.App. 413, 421, 429, 972 P.2d 522 (1999).
The Court of Appeals affirmed the summary judgment dismissal on the disability discrimination claim, but agreed with Pulcino that RCW 49.32.020 prohibits all forms of employer interference with organized workers, not just discriminatory terminations. See Pulcino, 94 Wash.App. at 422-24, 972 P.2d 522 (citing Bravo v. Dolsen Cos., 125 Wash.2d 745, 758, 888 P.2d 147 (1995) and Krystad v. Lau, 65 Wash.2d 827, 846, 400 P.2d 72 (1965)). Thus, the Court of Appeals held that the trial court improperly limited Pulcino's union discrimination claim to wrongful discharge, and, as a result of this erroneous conclusion, improperly excluded relevant evidence. Pulcino, 94 Wash.App. at 424-26, 972 P.2d 522.

ISSUES
We are asked to decide (1) whether Pulcino properly stated a claim for disability discrimination based upon FedEx's alleged failure to reasonably accommodate her during periods of temporary disability; (2) whether Pulcino's union discrimination claim is preempted by the Railway Labor Act; and (3) whether a union discrimination claim pursuant to RCW 49.32.020 must be predicated upon an employee's participation in specific statutorily protected activities, which then leads to discriminatory treatment.

I. DISABILITY DISCRIMINATION
Pulcino claims that the Court of Appeals failed to consider that her disability discrimination claim was based upon FedEx's refusal to accommodate her medical restrictions rather than discriminatory discharge. FedEx contends that temporary short-term orthopedic problems do not rise to the level of a disability recognized under Washington's antidiscrimination law. FedEx further contends that, even if Pulcino's condition could be considered a disability, it reasonably accommodated her by granting a medical leave of absence.
Although the Court of Appeals recognized that an employer's failure to reasonably accommodate a disabled employee constitutes unlawful discrimination, it ultimately affirmed the trial court's summary judgment dismissal on grounds indicating that it only considered whether Pulcino stated a claim for wrongful discharge. Pulcino, 94 Wash. App. at 429-30, 972 P.2d 522.
We agree with the Court of Appeals that Pulcino did not support a claim for wrongful discharge. FedEx terminated Pulcino because she did not find another suitable position within the 90-day leave of absence period. Pulcino did not introduce evidence showing that this nondiscriminatory reason for her discharge was pretextual.[1] *793 Pulcino also asserted, however, that FedEx wrongfully failed to accommodate her during periods of temporary disability that preceded her termination. The Court of Appeals did not address this aspect of her claim. We find that Pulcino's failure to accommodate claim was not subject to a summary judgment dismissal.
When reviewing an order of summary judgment, this court conducts the same inquiry as the trial court. East Wind Express, Inc. v. Airborne Freight Corp., 95 Wash.App. 98, 102, 974 P.2d 369 (1999) (citing Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982)). Summary judgment is proper if pleadings, depositions, affidavits, and admissions, viewed in a light most favorable to the nonmoving party, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. East Wind Express, 95 Wash.App. at 102, 974 P.2d 369.
Under Washington's Law Against Discrimination (Act), it is unlawful for an employer to discriminate against any person in the terms or conditions of employment or discharge any employee because of the presence of any sensory, mental, or physical disability. RCW 49.60.180(2), (3). An employer's failure to reasonably accommodate the sensory, mental, or physical limitations of a disabled employee constitutes discrimination unless the employer can demonstrate that such accommodation would result in an undue hardship to the employer's business. Snyder v. Medical Serv. Corp., 98 Wash.App. 315, 988 P.2d 1023 (1999) (citing Doe v. Boeing Co., 121 Wash.2d 8, 16, 18, 846 P.2d 531 (1993)).
"An employer who discharges, reassigns, or harasses for a discriminatory reason faces a disparate treatment claim; an employer who fails to accommodate the employee's disability, faces an accommodation claim." Hill v. BCTI Income Fund-I, 97 Wash.App. 657, 667, 986 P.2d 137 (1999) (citing Hume v. American Disposal Co., 124 Wash.2d 656, 880 P.2d 988 (1994); and Dean v. Municipality of Metro. Seattle, 104 Wash.2d 627, 708 P.2d 393 (1985)). Having concluded that Pulcino failed to properly support a wrongful discharge claim, we address only her accommodation claim.
An accommodation claim presents essentially two issues: (1) whether the employee was disabled or handicapped within the meaning of the Act; and (2) whether the employer met its affirmative obligation to reasonably accommodate the handicap. See Doe, 121 Wash.2d at 13-18, 846 P.2d 531; Snyder, 98 Wash.App. at 325-27, 988 P.2d 1023.
A. Disability
The Act itself does not define "disability." However, the Washington State Human Rights Commission, pursuant to its authority to promulgate rules to carry out the Act, defined a condition as a "`sensory, mental, or physical disability' if it is an abnormality and is a reason why the person having the condition... was discriminated against ...." WAC 162-22-020(2).[2] This court has acknowledged that this definition is problematic stating:
The WAC definition requires a factual finding of discrimination because of the condition in order to determine whether the condition is a "handicap" in the first place.
Doe, 121 Wash.2d at 15, 846 P.2d 531. Nonetheless, in Doe, this court applied the WAC definition and found that, although the employee had a medically cognizable and diagnosable condition (gender dysphoria), the employee was not "handicapped" for purposes of the Act because the employee could *794 not prove that he was discriminated against because of the abnormal condition. Doe, 121 Wash.2d at 17-18, 846 P.2d 531.
We find the circularity of the WAC definition makes it unworkable when an employee's claim is based upon an accommodation theory. The employee would, in effect, have to prove that the employer failed to accommodate the employee (i.e., discriminated against him or her) because of the employee's abnormal condition. This implies that the employer accommodates other employees; but, obviously, employees who are not disabled do not require such accommodation. Thus, we find that an accommodation claimant satisfies the "handicap" element of his or her claim by proving that (1) he or she has/had a sensory, mental, or physical abnormality and (2) such abnormality has/had a substantially limiting effect upon the individual's ability to perform his or her job.[3] An employee can show that he has a sensory, mental or physical abnormality, by showing that he or she has a condition that is medically cognizable or diagnosable, or exists as a record or history. See Phillips v. City of Seattle, 111 Wash.2d 903, 906-07, 766 P.2d 1099 (1989); WAC 162-22-020(2).
The dissent is almost entirely devoted to a survey of how other states have defined "disability" by statute. We agree that many other states have more restrictive definitions that are the product of legislative decision. In Washington, our regulation focuses on "`sensory, mental, or physical disability' if it is an abnormality[.]" WAC 162-22-020(2). By requiring that such abnormality must have a substantially limiting effect upon the individual's ability to perform his or her job, we have ruled out the trivial. To go beyond that limitation and adopt either the federal definition or chose one from another state, would be to undertake a task more appropriate for the Legislature. "[T]he imperative to decide disputes needs to be tempered by due consideration of the judiciary's role as one of the three coordinate branches of state government." Philip A. Talmadge, Understanding the Limits of Power: Judicial Restraint in General Jurisdiction Court Systems, 22 Seattle U.L.Rev. 695, 710 (1999).
Whether an employee has/had a handicapping condition is generally a question for the trier of fact. Doe, 121 Wash.2d at 15, 846 P.2d 531 (citing Phillips, 111 Wash.2d at 909, 766 P.2d 1099). The burden, however, is on the employee to present a prima facie case of discrimination, including medical evidence of a handicap. Simmerman v. U-Haul Co., 57 Wash.App. 682, 687, 789 P.2d 763 (1990). When reasonable minds could reach only one conclusion, a claim may be decided as a matter of law. See, e.g., Rhodes v. URM Stores, Inc., 95 Wash.App. 794, 799-800, 977 P.2d 651 (1999) (summary judgment dismissal affirmed where employee claimed that his drug dependency was medically documented but a doctor who evaluated him described him as a "marijuana abuser, not chemically dependent"); Simmerman, 57 Wash.App. at 687, 789 P.2d 763 (summary judgment dismissal affirmed where employee's only evidence of handicap was his own statement that he could perform "all job functions ... except for heavy lifting").
Here, Pulcino relied upon her own declaration and testimony that she suffered a lumbar strain and a broken foot, which caused her doctor to restrict her to light duty work. FedEx does not dispute that Pulcino actually suffered from such injuries, that her injuries constitute physical conditions that are "medically cognizable or diagnosable," or that her injuries substantially limited her *795 ability to perform her job. Thus, we find that Pulcino satisfied the "disability" element of her claim sufficiently to overcome summary judgment.
Contrary to FedEx's position, the Act is not limited to permanent disabilities and thus requires employers to reasonably accommodate temporary disabilities. We turn next to the reasonable accommodation question.
B. Reasonable Accommodation
To trigger the employer's duty of reasonable accommodation, the employee must give the employer notice of his or her disability. Snyder, 98 Wash.App. at 326, 988 P.2d 1023 (citing Goodman v. Boeing Co., 127 Wash.2d 401, 408, 899 P.2d 1265 (1995)). The employee has the burden of showing that a specific reasonable accommodation was available to the employer at the time the employee's physical limitation became known and that accommodation was medically necessary. MacSuga v. County of Spokane, 97 Wash.App. 435, 442, 983 P.2d 1167 (1999) (citing Barnett v. U.S. Air, Inc., 157 F.3d 744, 749 (9th Cir.1998)); Hill, 97 Wash.App. at 668, 986 P.2d 137 (citing Doe, 121 Wash.2d at 18-19, 846 P.2d 531). The burden then shifts to the employer to show that the proposed solution is not feasible. MacSuga, 97 Wash.App. at 442, 983 P.2d 1167 (citing Stone v. City of Mount Vernon, 118 F.3d 92, 98 (2d Cir.1997), cert. denied, 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998)).
An employer need not necessarily grant an employee's specific request for accommodation. Rather, an employer need only "reasonably" accommodate the disability. Snyder, 98 Wash.App. at 326, 988 P.2d 1023.
Reassignment is one method of accommodation. MacSuga, 97 Wash.App. at 442, 983 P.2d 1167 (citing 29 C.F.R. § 1630.2(o)(2)(ii)). When an employee bases a claim on the employer's failure to reassign to a different position, the employee must prove that he or she was qualified to fill a vacant position, and that the employer failed to take affirmative measures to make such job opportunity known to the employee and to determine whether the employee was in fact qualified for such position. Dean, 104 Wash.2d at 637-39, 708 P.2d 393; Snyder, 98 Wash.App. at 325, 988 P.2d 1023; Hill, 97 Wash.App. at 668, 986 P.2d 137.
An employer, however, is not required to reassign an employee to a position that is already occupied, to create a new position, to alter the fundamental nature of the job, or eliminate or reassign essential job functions. MacSuga, 97 Wash.App. at 442, 983 P.2d 1167 (citing White v. York Int'l Corp., 45 F.3d 357, 362 (10th Cir.1995); Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 195 (3d Cir.1999); and Barnett, 157 F.3d at 751).
Generally, whether an employer made reasonable accommodation or whether the employee's request placed an undue burden on the employer are questions of fact for the jury. Snyder, 98 Wash.App. at 327, 988 P.2d 1023 (citing Phillips, 111 Wash.2d at 910-11, 766 P.2d 1099). However, certain types of requests have been found unreasonable as a matter of law. See, e.g., Snyder, 98 Wash.App. at 327-28, 988 P.2d 1023 (an employee's request for a new supervisor or a position with a new supervisor to accommodate her "emotional condition" was unreasonable as a matter of law).
Here, Pulcino triggered FedEx's duty of reasonable accommodation when she presented FedEx with the light duty restriction from her doctor. The primary accommodation that Pulcino sought was to be transferred to a less physically demanding position, such as a courier or customer service agent position.
We find there are disputed issues of material fact regarding whether Pulcino was qualified to fill vacant positions when she was placed on involuntary leaves of absence. While FedEx claims that all other positions required heavier lifting than Pulcino's position, Pulcino claims that she observed couriers on three different routes and found their positions easier than her position as a handler. She also claims that others with less seniority were placed in the easier courier positions. FedEx's general policy of not providing light duty positions to part-time employees, *796 shows that FedEx failed to take affirmative steps to determine whether Pulcino was in fact qualified for any vacant positions. See Dean, 104 Wash.2d at 637-39, 708 P.2d 393.
An employer should not be able to hide behind a policy of not providing light duty for part-time employees when such a policy is unreasonable. In an era where some employers rely heavily on a part-time workforce, such a policy may be subject to question. The extent that FedEx utilized part-time employment and the reasonableness of its no light duty policy will be questions for the jury. See Snyder, 98 Wash.App. at 327, 988 P.2d 1023.
We cannot say as a matter of law that Pulcino's temporary disability was reasonably accommodated by an unpaid medical leave of absence. Nor can we say that her request for reassignment to a different position was un reasonable as a matter of law. Thus, we reverse the summary judgment dismissal of Pulcino's disability discrimination claim.
In any event, Pulcino alleged that FedEx's conduct was motivated by anti-union animus and, thus, as part of her interrelated union discrimination claim, Pulcino should have been able to introduce evidence that FedEx did not accommodate her lumbar strain and broken foot.

II. PREEMPTION
FedEx claims that Pulcino's union discrimination claim is preempted by the Railway Labor Act (RLA), 45 U.S.C. §§ 151-164, because resolution of her claim requires an interpretation of the collective bargaining agreement (CBA), which is the "exclusive province of a System Board of Adjustment." FedEx's Pet. for Review at 6-7, 9 (citing Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 258, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994)). According to FedEx, the absence of an express provision on a particular issue "does not diminish the exclusive jurisdiction of the System Board of Adjustment," so long as the employee's claim is "substantially dependent" upon an analysis of the CBA. FedEx's Pet. for Review at 7-8, 10; see also FedEx's Supp. Br. at 3-5.
Pulcino claims that FedEx failed to meet its burden of proving preemption because FedEx did not provide evidence that it reached an agreement with the union that the attendants would not be eligible to transfer into other FedEx jobs through internal career opportunity postings. Alternatively, Pulcino asserts that there is no preemption because her claim involves a nonnegotiable substantive right that is independent of the CBA.
A federal statute will not be read to supersede a state's historic powers unless that is Congress's clear and manifest purpose. Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 715, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Because employment standards are within a state's traditional police powers, preemption "should not be lightly inferred." Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 21, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987).
Congress's purpose in passing the RLA was to promote stability in labormanagement relations. Hawaiian Airlines, 512 U.S. at 252, 114 S.Ct. 2239 (citing Atchison, T. & S.F.R. Co. v. Buell, 480 U.S. 557, 562, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987); and 45 U.S.C. § 151a). To this end, the RLA establishes comprehensive and exclusive arbitral mechanisms for resolving labor disputes concerning rates of pay, rules, or working conditions. Hawaiian Airlines, 512 U.S. at 252, 114 S.Ct. 2239. Under the RLA, "major" disputes are those that relate to the formation of CBAs or efforts to secure them, and "minor" disputes are those that arise out of grievances or the interpretation or application of CBAs in a particular fact situation. Hawaiian Airlines, 512 U.S. at 252-53, 114 S.Ct. 2239 (citing Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989); Trainmen v. Chicago R. & I.R. Co., 353 U.S. 30, 33, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); and 45 U.S.C. § 151a). When an employee's complaint constitutes a "major" or "minor" dispute as defined by the RLA, any potentially available state law remedy is preempted. *797 Hawaiian Airlines, 512 U.S. at 253, 114 S.Ct. 2239.
In Hawaiian Airlines, the United States Supreme Court most recently analyzed the scope of federal preemption under the RLA; that analysis is controlling here. There an aircraft mechanic, after first invoking the grievance procedure under a CBA, filed suit in state court claiming that his discharge was retaliatory and violated the Federal Aviation Act of 1958 and Hawaii's Whistleblower Protection Act. Hawaiian Airlines, 512 U.S. at 250, 114 S.Ct. 2239. The Supreme Court found that the mechanic's wrongful discharge claims were not preempted because they involved substantive rights provided by state and federal law, independent of the CBA. Hawaiian Airlines, 512 U.S. at 256-57, 114 S.Ct. 2239.
The Court found that the RLA's preemption of "minor" disputes extends only to disputes that invoke contract-based rights and are "grounded in the CBA." Hawaiian Airlines, 512 U.S. at 254-56, 114 S.Ct. 2239. "`The distinguishing feature of [a minor dispute] is that the dispute may be conclusively resolved by interpreting the existing [CBA]'." Hawaiian Airlines, 512 U.S. at 256, 114 S.Ct. 2239 (quoting Consolidated Rail, 491 U.S. at .305, 109 S.Ct. 2477). But where the resolution of a state law claim depends upon "purely factual questions" about an employee's conduct or an employer's conduct and motives, and does not require a court to interpret any term of a CBA, then such claim is not preempted. Hawaiian Airlines, 512 U.S. at 261, 114 S.Ct. 2239 (quoting Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 407, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988)).
When the meaning of contract terms is not at issue, the fact that a CBA will be consulted in the course of state law litigation, or that a remedy may potentially be available under a CBA, does not deprive an employee of independent remedies available under state law. Hawaiian Airlines, 512 U.S. at 261 n. 8, 114 S.Ct. 2239 (citing Livadas v. Bradshaw, 512 U.S. 107, 124, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); and Lingle, 486 U.S. at 405-07, 413 n. 12, 108 S.Ct. 1877).
Here, the CBA does not contain any provision requiring the attendants to be treated as external candidates when applying for other positions with FedEx. Thus, resolution of Pulcino's claim does not require this Court to interpret any provision of a CBA. See Hawaiian Airlines, 512 U.S. at 254-56, 261, 114 S.Ct. 2239.
Further, Pulcino's claim is independent of the CBA; it is based on her statutory right to be free from "interference, restraint or coercion" related to her participation in concerted activities for the purpose of improving her working conditions. See RCW 49.32.020. Pulcino does not assert that FedEx violated the CBA; rather, she asserts that FedEx discriminated against her based on its antiunion sentiments. More specifically, she claims that antiunion animus was the motivating factor behind FedEx placing her in the handler position rather than a courier position and failing to accommodate her medical restrictions or provide safety equipment.
Pulcino's claim raises "purely factual questions" concerning FedEx's conduct and motives and, thus, does not require an interpretation of the CBA. See Hawaiian Airlines, 512 U.S. at 261, 114 S.Ct. 2239. Pulcino's state law claims are not preempted merely because the CBA may be consulted to determine if there were legitimate contractual reasons for FedEx's allegedly disparate treatment of her. See Livadas, 512 U.S. at 124, 114 S.Ct. 2068.

III. UNION DISCRIMINATION
FedEx contends that an adverse employment action does not constitute actionable union discrimination pursuant to RCW 49.32.020 unless the employer based such action upon the employee's participation in "activities the statute specifically protects." FedEx's Pet. for Review at 13. Although FedEx concedes that the National Labor Relations Act (NLRA) 29 U.S.C. §§ 151-169, prohibits an employer from discriminating in the terms or conditions of employment for the purpose of discouraging union membership, it contends that RCW 49.32.020 is not parallel to the NLRA and, thus, does not protect against discrimination based on union membership alone.
*798 Pulcino claims that this court should not consider FedEx's argument because this issue was not developed at the trial level. In the alternative, Pulcino claims that she engaged in statutorily protected activities by voting to retain the union in defiance of FedEx's "threat" that such action would subject the attendants to layoff. Pulcino's Answer to Pet. for Review at 18-19.
Although an appellate court "may refuse to review any claim of error which was not raised in the trial court," RAP 2.5(a), this rule "`does not apply when the question raised affects the right to maintain the action.'" Jones v. Stebbins, 122 Wash.2d 471, 479, 860 P.2d 1009 (1993) (quoting New Meadows Holding Co. v. Washington Water Power Co., 102 Wash.2d 495, 498, 687 P.2d 212 (1984)). Furthermore, RAP 2.5(a) is permissive in nature and does not automatically preclude the introduction of an issue at the appellate level. Because FedEx's issue affects Pulcino's right to maintain her claim, we address the issue.
In Krystad v. Lau, 65 Wash.2d 827, 846, 400 P.2d 72 (1965), this court first recognized that RCW 49.32.020[4] confers actionable substantive rights including the right to be "free from coercion, interference and restraint from and by their employers in organizing or joining a labor union and in designating such union as their agent for collective bargaining." (Emphasis added.) Much more recently, this court concluded that "interference, restraint, or coercion" has a broader meaning than "discharge" and, thus, RCW 49.32.060 prohibits not only wrongful terminations but a "wide range" of other adverse employment actions as well. Bravo v. Dolsen Cos., 125 Wash.2d 745, 756, 888 P.2d 147 (1995). Consequently, we agree with the Court of Appeals that the trial court improperly limited Pulcino's union discrimination claim to a wrongful discharge theory.
FedEx, however, urges a different basis to affirm the trial court's directed verdict. It claims that Pulcino's union membership alone was not sufficient to satisfy a statutory requirement that actionable discriminatory employment action be based upon the employee's participation in "concerted activities." We disagree.
Although the Bravo court did not decide this precise issue, it did interpret the language "concerted activities" to mean activities that employees undertake "in concert togetherfor the purpose of improving their working conditions." 125 Wash.2d at 752, 888 P.2d 147. The Bravo court thus concluded that RCW 49.32.020 extends to nonunion employees stating:
if employees' right to act in concert to improve their working conditions existed only after they formed a union, employees would enjoy no protection to enable unionization. That could not have been the legislative intent, given its recognition that the unorganized worker is at an enormous disadvantage in seeking to obtain acceptable terms of employment.
125 Wash.2d at 754, 888 P.2d 147 (citing RCW 49.32.020).
We find that the act of joining, belonging to, or voting against decertification of a labor union constitutes an activity undertaken together for the purpose of improving working *799 conditions, i.e., a "concerted activity." Similar to the reasoning in Bravo, the Legislature could not have intended to prohibit "interference, restraint, or coercion" that is based upon an employee's active participation in labor organizing or union activity, while leaving union members unprotected after they attain their collective bargaining goals.
Furthermore, our broad interpretation of the "concerted activities" requirement is consistent with federal case law.[5] Contrary to FedEx's suggestion, the language of the NLRA is very similar to the language here,[6] and this court considers persuasive the federal cases interpreting it. Bravo, 125 Wash.2d at 755, 888 P.2d 147.

CONCLUSION
In sum, we reverse the summary judgment dismissal of the disability discrimination claim because there are disputed issues of material fact regarding whether FedEx reasonably accommodated Pulcino's temporary disabilities. We find that Pulcino's union discrimination claim is not preempted by the RLA because it involves substantive rights independent of the CBA. The Court of Appeals properly reversed the directed verdict because RCW 49.32.020 prohibits all forms of employer interference with organized workers, not just discriminatory terminations. Bravo, 125 Wash.2d at 758, 888 P.2d 147. We further hold that union membership satisfies RCW 49.32.020's "concerted activities" requirement.
GUY, C.J., SMITH, JOHNSON, TALMADGE, SANDERS, and BRIDGE, JJ., concur.
MADSEN, J. (concurring in part/dissenting in part).
By allowing the plaintiff's cause of action for disability discrimination to go forward, the majority trivializes the discrimination suffered by persons with disabilities. Moreover, the extremely broad definition proposed by the majority perverts the objective of the laws against discrimination in employment based upon disability, allowing common personal injuries to stand in the stead of true disability. This is not the aim of such laws.
The majority concludes that physical injuries which heal in a relatively short period of time, here a strained back and a broken foot, are "disabilities" within our state laws granting a civil rights cause of action to any person who is discriminated against in employment on the basis of "the presence of any sensory, mental, or physical disability." RCW 49.60.030(1)(a), .030(2); see RCW 49.60.180 (making it an unfair practice for any employer to discriminate "in compensation or in other terms or conditions of employment because of ... the presence of any sensory, mental, or physical disability"). The majority reaches its conclusion after judicially defining "disability" and then applying that definition in a way that encompasses such injuries.
The majority's holding is inconsistent with the Legislature's classification of disabled persons' right to be free from discrimination as civil rights. It is inconsistent with the history of such antidiscrimination laws in this country. It is inconsistent with the overwhelming number of state laws respecting *800 disability discrimination. It is inconsistent with federal law having the same purpose as our state statutes.
I cannot join the majority's efforts in taking this state so far afield.
The history of discrimination against those who are disabled has involved several generally recognized stages. Through much of Western history, being a person with a disability was seen through religion as a moral failing, involving commission of some sin warranting the condition. Wendy E. Parmet, Plain Meaning and Mitigating Measures: Judicial Interpretations of the Meaning of Disability, 21 Berkeley J. Empl. & Lab. L. 53, 56 (2000). Early in the twentieth century, things had changed, and disability was seen in medical terms, which could be diagnosed, treated, and sometimes cured. Id. "From this perspective, treatment, care, and pity were the typical social responses." Id. Then, following the Second World War, "and the concomitant backlash against Nazi eugenicist policies, as well as the rise of the civil rights movement, a new disability rights movement emerged." Id. This movement was premised in large part on the principle that the difficulties that disabled persons encounter are not so much the result of their disabilities as the result of their social treatment. Id. at 56-57.
This "social vision" of disability became the foundation for disability anti-discrimination laws, such as Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1994), as amended in 1974, Pub.L. No. 93-516, 88 Stat. 1617 (1974), which prohibits recipients of federal funding from discriminating against "otherwise qualified individuals" because of a disability. Parmet, 21 Berkeley J. Empl. & Lab. L., at 57-58. The definition of disability in the act states that an individual with a disability is "[a]ny person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such as impairment." Id. 29 U.S.C. § 705(20)(B) (1994). The same approach was followed in the Americans with Disabilities Act of 1990(ADA), which adopted the Rehabilitation Act's definition of disability. Parmet, 21 Berkeley J. Empl. & Lab. L., at 59-60.
Washington State's inclusion in 1973 of those with "the presence of any sensory, mental, or physical disability" as a protected class in our civil rights laws thus mirrors the national response to the post-world-war-II disability rights movement. Laws of 1973, 1st Ex.Sess., ch. 214. The historical antecedents of antidiscrimination laws such as ours involve discrimination, in a societal context, against those with disabilities. People were shunned, were excluded, were pitied  because of disability. They were denied housing and jobs. Many could not access the places where the rest of society carried on their lives  stores, theaters, parks, restaurants, buses.
There is nothing about a back strain of short duration, or a broken foot that heals, which brings it within this historical context.
Further demonstration of how far afield the majority's view of what constitutes a disability is found in the laws of the vast majority of other states, which do not recognize minor injuries or conditions of short duration as disabilities. Of the other 49 states, 27 have laws defining "disability" in much the same way as the Rehabilitation Act and the ADA define the term.[1] Courts in these states have held, as have the federal *801 courts, that a temporary injury is not a disability for purposes of discrimination laws. Bogue v. Better-Bilt Aluminum Co., 179 Ariz. 22, 28-29, 875 P.2d 1327 (1994) ("trivial or minor impairments that do not affect an individual's general ability to secure, retain, or advance in employment do not qualify the individual as handicapped"; "`the very concept of an impairment implies a characteristic that is not commonplace'") (citation omitted); Hallgren v. Integrated Fin. Corp., 42 Mass.App. 686, 679 N.E.2d 259 (1997) (knee injury from which plaintiff fully recovered in a month with no residual effects is not a handicap under state statute); Chiles v. Machine Shop, Inc., 238 Mich.App. 462, 481, 606 N.W.2d 398, 409 (1999) (temporary back injury with permanent lifting retroactions of 50 pounds did not constitute a disability under state statute; the "inclusion of common ailments and injuries would mean that nearly everyone would qualify as `disabled' at some time during their life" and "[a]llowing nearly everyone to take advantage of the [state act] would undermine the purpose of the act itself, which was to assure that `the truly disabled' will not face discrimination because of stereotypes"); Cook v. Atoma Int'l of Am., Inc., 930 S.W.2d 43, 47 (Mo.Ct.App.1996) (temporary injuries which are medically treatable are not actionable under state statute; "[i]f temporary injuries were to be covered under the act, nearly any injury suffered by a person would qualify under the statute and thereby render the act meaningless"); Maloney v. Barberton Citizens Hosp., 109 Ohio App.3d 372, 376, 672 N.E.2d 223, 225 (1996) (employee's temporary back injury which caused pain and inconvenience for a definite period of time, but had no adverse residual effects, was not a handicap under state statute); Imler v. Hollidaysburg Am. Legion Ambulance Serv., 731 A.2d 169, 174 (Pa.Super.Ct.1999) (herniated disc condition causing back impairment for eighteen months was a disability of limited duration which did not constitute a disability for purposes of state's Human Rights Act), appeal denied 560 Pa. 706, 743 A.2d 920 (1999); Providence Journal Co. v. Mason, 116 R.I. 614, 621, 624, 359 A.2d 682, 687, 90 A.L.R.3d 383 (1976) (although literal reading of state statute suggests any physical disability caused by injury is a "physical handicap," the legislature could not have intended that result; a "physical handicap" "must be a serious injury or impairment of more than temporary nature"; plaintiff's whiplash injuries did not constitute a "physical handicap" within meaning of statute).
Other states' laws also exclude minor and temporary injuries. A number of states have definitions which, while varying from the federal definition in some respect, are similar, and at least as restrictive in what constitutes a disability. For example, VA.CODE ANN. § 51.5-3 (Michie) defines "person with a disability" as "any person who has a physical or mental impairment which substantially limits one or more of his major life activities or has a record of such impairment[.]" Georgia's statute defines an individual with disabilities as "any person who has a physical or mental impairment which substantially limits one or more of such person's major life activities and who has a record of such impairment." GA.CODE ANN. § 34-6A-2(3) (emphasis added). The Georgia courts look to federal law in deciding whether an impairment "substantially limits" employment activity because of the similarity of the Rehabilitation Act's definition. Hennly v. Richardson, 264 Ga. 355, 357, 444 S.E.2d 317, 320 (1994). New York's statute defines "disability" as
(a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic, or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment ....
N.Y. EXEC. LAW § 292(21) (West 1993 & Supp.2000). The court in Aquinas v. Federal Express Corp., 940 F.Supp. 73, 79-80 (S.D.N.Y.1996) reasoned that to the extent that this law differs from the ADA, the New York law is the more restrictive because it requires "`prevention,'" rather than "substantial impairment," of a "`normal bodily function'" rather than of "a major life activity." *802 UTAH CODE ANN. § 34A-5-102(5) (Michie 1997 & Supp.2000) defines disability as "a physical or mental impairment that substantially limits one or more of an individual's major life activities." WIS. STAT. § 111.32(8) defines "individual with a disability" as one who "(a) [h]as a physical or mental impairment which makes achievement unusually difficult or limits the capacity to work; (b) [h]as a record of such an impairment; or (c) [i]s perceived as having such an impairment." Florida's statute defines "physically disabled person" for purposes of discrimination in employment as "any person having a physical impairment that substantially limits one or more major life activities." FLA. STAT. ANN. § 413.08(6)(a) (West). This statute has been construed in conformity with the federal Rehabilitation Act and the ADA. Greene v. Seminole Elec. Coop., Inc., 701 So.2d 646, 647 (Fla.Dist.Ct.App.1997) (citing Brand v. Florida Power Corp., 633 So.2d 504 (Fla.Dist.Ct.App.1994)).
775 ILL. COMP. STAT. 5/1-103(I) provides that "handicap" means a "determinable physical or mental characteristic of a person, including, but not limited to, a determinable physical characteristic which necessitates the person's use of a guide, hearing or support dog, the history of such characteristic, or the perception of such characteristic by the person complained against, which may result from disease, injury, congenital condition of birth or functional disorder ...." While this does not limit disabilities to conditions which are "`grave or extreme in nature[,]'" it excludes "`transitory and insubstantial'" conditions and "`conditions which are not significantly debilitating or disfiguring.'" Anderson v. Modern Metal Prods., 305 Ill. App.3d 91, 98, 711 N.E.2d 464, 468, 238 Ill. Dec. 361 (1999) (quoting 56 111. Admin. Code 2500.20(b) (1996)). In Anderson the employee's medical records disclosed only a 1994 diagnosis of right ulnar neuritis, thoracolumbar strain, and right shoulder strain, from which she was released to regular work with no restrictions except to avoid repetitive work; a 1995 diagnosis of chronic lumbar strain and a 25-pound weight limit; and a post-discrimination-claim diagnosis of myofascial syndrome, for which she was placed on light duty. The court held that the record supported the investigator's conclusion that the employee's condition was transitory in nature. Anderson, 305 Ill.App.3d at 98, 238 Ill.Dec. 361, 711 N.E.2d 464.
Some states have specific statutory restrictions which preclude temporary conditions. CONN. GEN.STAT. ANN. § 1-1f(b) (West) provides that an individual is physically disabled "if he has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device." (Emphasis added.) Georgia's statute also falls into this category.
Several states require that a physical disability be a "substantial" disability for a person to come within the scope of the laws against discriminating against persons with a disability. IDAHO CODE § 56-701A(3) (Michie); IOWA CODE ANN. § 216.2(5) (West 1994 & Supp.2000) (also includes HIV positive persons and persons with AIDS); KY.REV.STAT. ANN. 207.130(2) (Lexis); IND.CODE ANN. § 22-9-1-3(r) (Lexis 1997 & Supp.2000); S.C.CODE ANN. § 43-33-560 (Law. Coop.1985 & West Supp.1999). The Supreme Court of Iowa has looked to federal law as analogous as to what constitutes a "disability" within state law. Bearshield v. John Morrell & Co., 570 N.W.2d 915, 918 (Iowa 1997).
Some states provide a detailed definition of what constitutes a disability. Such statutes also provide definitions that are generally more restrictive than the majority's. For example, the California statute provides that a physical disability includes
[h]aving any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that does both of the following:... [a]ffects one or more of the following bodily systems: neurological, immunological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine ... [and] [l]imits an individual's ability to participate in major life activities.

CAL. GOV'T CODE § 12926(k) (West) (emphasis added). Also included is "any other health impairment ... that requires special *803 education or related services." "Mental disabilities" are also defined, and include "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." Id. § 12926(i). Conditions excluded under the ADA are also exclusions under California law. Id.[2]
The only other state with language like that in RCW 49.60 is Arkansas. ARK.CODE ANN. § 16-123-107(a) (Michie) provides that "[t]he right of an otherwise qualified person to be free from discrimination because of race, religion, national origin, gender, or the presence of any sensory, mental, or physical disability is recognized as and declared to be a civil right. Th[e] right ... include[s] ... [t]he right to obtain and hold employment without discrimination[.]" Id., § 16-123-107(a)(1). Unlike Washington's statute, which does not define "any sensory, mental, or physical disability," Arkansas defines "disability" as "a physical or mental impairment that substantially limits a major life function, but `disability' does not include" specific named conditions, including compulsive gambling, current use of illegal drugs, and alcoholism. Id., § 16-23-102(3) (emphasis added).
Other state's statutes do not prohibit discrimination in the private sector on the basis of disability.[3]
Tennessee's statutes prohibit employment discrimination based solely upon "any physical, mental or visual handicap of the applicant ...." TENN.CODE ANN. § 8-50-103 (Michie). Texas law defines "person with a disability" as "a person who has a mental or physical disability, including mental retardation, hearing impairment, deafness, speech impairment, visual impairment, or any health impairment that requires special ambulatory devices or services." TEXAS HUM. RES.CODE ANN. § 121.002(4) (West 1990 & Supp.2000).
As can be seen, most state laws are far more restrictive in the definition of what constitutes a disability than the majority's view that a temporary back injury and a broken bone which heals may be disabilities *804 under RCW 49.60. Far from suggesting that our law is more protective, this fact demonstrates how far out of step the majority opinion is. I cannot believe that our state legislature intended to include such temporary injuries as disabilities subject to civil rights protection.
Also contrary to the majority's view, the ADA and cases interpreting it should not be summarily dismissed. Both the ADA and our civil rights laws seek to prevent discrimination against the disabled in employment. This court has previously held that "when Washington statutes or regulations have the same purpose as their federal counterparts, we will look to federal decisions to determine the appropriate construction." Clarke v. Shoreline School Dist. No. 412, 106 Wash.2d 102, 118, 720 P.2d 793 (1986). In Clarke, which involved a claim of disability discrimination, the court looked to federal case law construing the definition of "otherwise qualified" person in the federal Rehabilitation Act, and said "[w]e believe a similar construction applies to RCW 49.60.180." Clarke, 106 Wash.2d at 119, 720 P.2d 793; see also Dean v. Municipality of Metro. Seattle, 104 Wash.2d 627, 637, 708 P.2d 393 (1985) (stating that federal law may be considered instructive with regard to our state discrimination laws); Fahn v. Cowlitz County, 93 Wash.2d 368, 376, 610 P.2d 861, 621 P.2d 1293 (1980) (because federal law, Title VII of the Civil Rights Act of 1964, is to be construed broadly, and the legislature has directed that RCW 49.60 be liberally construed, relevant federal cases may be looked to for guidance); cf. Fell v. Spokane Transit Auth., 128 Wash.2d 618, 911 P.2d 1319 (1996) (looking to the ADA to determine compliance with state law on accommodating persons with disabilities).
While this court is not bound by federal case law construing the ADA, the civil rights for disabled persons embodied in this state's statutes have the same purpose as the ADA  the prevention of, and redress for, discrimination on the basis of disability. It is appropriate to consider what constitutes a disability under federal law. As the majority acknowledges, temporary conditions do not constitute disabilities under the ADA.
Finally, commentators have also rejected the premise that common injuries constitute disabilities under laws against discrimination based upon disability. As a leading treatise states:
To include only serious conditions of some extended duration within the meaning of the term "handicap" will prevent an unwarranted extension of handicapped discrimination legislation to subsume a more trivial type of personal injury.... [I]t is doubtful that any legislature intended, or even envisioned, that its handicapped discrimination laws would be interpreted to address the problems associated with a sprained finger or ankle.
3A Arthur Larson and Lex K. Larson, Employment Discrimination, § 107.32(c), at 22-131 (1991). In an article analyzing the federal Rehabilitation Act and Washington's law, another author wrote that
it would seem that the proper approach to coverage is to limit the definition of "handicap" to individuals who have real and substantial disabilities along the lines set forth under the [federal] Rehabilitation Act [of 1973] [the same definition is used in the Americans with Disabilities Act]. This approach offers guidance to employers in terms of the prospective application of the law. It focuses administrative and judicial resources where they are needed most, and it offers protection to those who need protection without opening the floodgates to frivolous or vexatious litigation. Moreover, some limitation in defining who is handicapped is essential in order for the concept of reasonable accommodation to be workable.
Lee Miller, Hiring the Handicapped: An Analysis of Laws Prohibiting Discrimination Against the Handicapped in Employment, 16 Gonz. L.Rev. 23, 35 (1980-81) (footnotes omitted).
I agree with the majority that the Human Rights Commission's regulatory definition of a "sensory, mental or physical disability" is unworkable. First, it is circular, though not for the reason stated by the majority. The definition in WAC 162-22-040(1) is circular because it first requires a finding of discrimination in order to determine what constitutes a disability for purposes of the laws against discrimination. Second, it is so expansive that it "bring[s] virtually everyone within its *805 ambit." See Miller, 16 Gonz. L.Rev. at 30-31.[4] However, I would not trade the regulatory definition for the majority's inclusion of commonplace injuries.[5]
I would hold that as a matter of law plaintiff's claimed disabilities do not constitute disabilities within the meaning of our statutes prohibiting discrimination on the basis of disability.
ALEXANDER, J., concurs.
NOTES
[1] See Swinford v. Russ Dunmire Olds., Inc., 82 Wash.App. 401, 406, 415, 918 P.2d 186 (1996) (employer terminated employee following a disability leave because replacement employee was more productive; employee failed to introduce medical evidence of a handicap and did not prove that nondiscriminatory reason for discharge was a pretext).
[2] WAC 162-22-020(2) provides in pertinent part:

A condition is a "sensory, mental, or physical disability" if it is an abnormality and is a reason why the person having the condition did not get or keep the job in question, or was denied equal pay for equal work, or was discriminated against in other terms and conditions of employment, or was denied equal treatment in other areas covered by the statutes. In other words, for enforcement purposes a person will be considered to be disabled by a sensory, mental, or physical condition if he or she is discriminated against because of the condition and the condition is abnormal.
[3] We recognize that the Americans with Disability Act of 1990's (ADA) definition of "disability" is narrower. Section 12102(2)(A) defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of [the] individual." 42 U.S.C. § 12102(2)(A). Section 1630.2(j)(2) of the Code of Federal Regulations lists three factors to consider in determining whether an individual is substantially limited in a major life activity: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2). Given the ADA's focus on the duration of the disability in contrast to our definition of handicap, FedEx improperly relies upon federal case law holding that a temporary injury with minimal residual effects cannot be the basis for a sustainable claim under the ADA. See, e.g., Sanders v. Arneson Prods., Inc., 91 F.3d 1351, 1354 (1996).
[4] RCW 49.32.020 provides as follows:

In the interpretation of this chapter and in determining the jurisdiction and authority of the courts of the state of Washington, as such jurisdiction and authority are herein defined and limited, the public policy of the state of Washington is hereby declared as follows:
WHEREAS, Under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protections; therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the state of Washington are hereby enacted.
(Emphasis added.)
[5] See, e.g., Williams Enters., Inc. v. National Labor Relations Bd., 956 F.2d 1226, 1229, 1231 (D.C.Cir.1992) (employer violated § 8(a)(1) of NLRA by informing union employees of predecessor employer that its plant would be nonunion); Microimage Display Div. of Xidex Corp. v. National Labor Relations Bd., 924 F.2d 245, 251, 253 (D.C.Cir.1991) (an employer's unilateral change in an employment condition violated § 8(a)(1) because such action "telegraph[ed] to the employees that the Union was irrelevant"; employer's threat to transfer work from a union to a nonunion plant also violated § 8(a)(1) because decision was motivated by a desire to be rid of the union).
[6] Section 7 of the NLRA, 29 U.S.C. § 157, provides in pertinent part:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection,...
(Emphasis added.) Section 8(a), 29 U.S.C. § 158(a), provides in pertinent part:
It shall be an unfair labor practice for an employer  (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title....
[1] These states are: Alaska (ALASKA STAT. § 18.80.300(12) (Lexis)); Arizona (ARIZ.REV.STAT. ANN. § 41.1461) (West); Colorado (COLO.REV. STAT. § 24-34-301(2.5) (Bradford)); Delaware (DEL.CODE ANN. (Lexis)) tit. 19 § 722(4)); Hawaii (HAW.REV.STAT.ANN.§ 378-1) (Michie)); Kansas (KAN.STAT.ANN. § 44-1002(j)); Louisiana (LA.REV.STAT.ANN. § 46:2253(1) (West)); Massachusetts (MASS. GEN. LAWS ANN. ch. 151B § 1(17) (West)); Michigan (MICH.STAT.ANN. § 3550(103)(d) (L 1998 & Supp.2000)); Minnesota (MINN.STAT. ANN. § 363.01(13) (West 1996 & Supp.2000)); Missouri (MO.REV.STAT. § 213.010(4) (West 1996 & Supp.2000)); Montana (MONT.CODE ANN. § 49-3-101(3)); Nebraska (NEB.REV. STAT. § 48-1102(9) (Michie)); Nevada (NEV.REV. STAT. § 613.310(1)); New Hampshire (N.H.REV. STAT. ANN. § 354-A:2(IV) (Michie)); New Mexico (N.M. STAT. ANN. § 28-1-2(M) (Michie)); North Carolina (N.C. GEN.STAT. ANN. § 168A-3(4a)); North Dakota (N.D. CENT.CODE § 14-02.4-02(3)); Ohio (OHIO REV.CODE ANN. § 4112.01(13) (Anderson)); Oklahoma (OKLA. STAT. ANN. tit. 25 § 1301(4) (West)); Oregon (OR.REV.STAT. ANN. § 659.400(1) (Butterworth)); Pennsylvania (43 PA. CONS.STAT. ANN. § 954(p.1) (West 1991 & Supp.2000)); Rhode Island (R.I. GEN. LAWS § 28-5-6(9) (Michie)); South Dakota (S.D. CODIFIED LAWS § 20-13-1(4) (Michie)); Vermont (VT. STAT. ANN. tit. 21, § 495d(5) (Butterworth)); West Virginia (W. VA. CODE ANN. § 5-11-3(m) (Michie)); Wyoming (WY. RULES AND REG. EMP. LS ch. 10, § 2(a)).
[2] Other states also have detailed lists of disabling conditions. See ME.REV. STAT. ANN. tit. 5, § 4553(7-A) (West 1989 & Supp.1999), which provides that "physical or mental handicap" means "any disability, infirmity, malformation, disfigurement, congenital defect or mental condition caused by bodily injury, accident, disease, birth defect, environmental conditions, or illness, and also includes the physical or mental condition of a person which constitutes a substantial handicap as determined by a physician or, in the case of mental handicap, by a psychiatrist or psychologist, as well as any other health or sensory impairment which requires special education, vocational rehabilitation or related services." Maine's statute goes on to provide that a person with a physical or a mental disability is a "person who ... [h]as a physical or mental disability... [h]as a record of a physical or mental disability ... or [i]s regarded as having a physical or mental disability." Id. § 4553(7-B). MD. CODE ANN. art. 49B, § 15 (Michie 1998 & Supp. 1999) provides that "disability" means "any physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impairment, deafness or hearing impairment, muteness or speech impediment or physical reliance on a seeing eye dog, wheelchair, or other remedial appliance or device; and any mental impairment or deficiency as, but not limited to, retardation or such other which may have necessitated remedial or special education and related services." N.J.REV.STAT. ANN. § 10:5-5(q) (West) defines "handicapped" as "suffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. Handicapped shall also mean suffering from AIDS or HIV infection."
[3] ALA.CODE § 21-7-1 (Law.Coop.) states that it is "the policy of this state to encourage and enable the blind, the visually handicapped and the otherwise physically disabled to participate fully in the social and economic life of the state and to engage in remunerative employment." Alabama does prohibit discrimination against such disabled persons in the public sector. Id. § 21-7-8. Mississippi similarly prohibits discrimination in the public sector. MISS.CODE. ANN. 43-6-15 (Law. Coop.). Neither of these states' statutes defines handicap or disability.
[4] This court defined "handicap" as used in former RCW 49.60.030 and .180 when rejecting a due process vagueness challenged, relying on the common dictionary definition. Chicago, Milwaukee, St. Paul & Pac. RR. v. Washington State Human Rights Comm'n, 87 Wash.2d 802, 805, 557 P.2d 307 (1976). The court said that a "handicap" connotes a "condition that prevents normal functioning in some way. A person with a handicap does not enjoy, in some manner, the full and normal use of his sensory, mental, or physical faculties." The court noted the dictionary definition: "`a disadvantage that makes achievement unusually difficult; esp: a physical disability that limits the capacity to work.'" Id. (quoting Webster's Third New International Dictionary (1961)). This definition is not helpful here because it does not resolve the question whether there is a durational aspect of "disability" for purposes of RCW 49.60.
[5] The majority's analysis also inconsistently states that the employee has the burden to present a prima facie case of discrimination, including medical evidence of a handicap, and then allows the plaintiff's action to go forward based upon her own declaration and testimony. Majority, at 795.

Significantly, the majority's definition of disability does not leave any room for the case where the discrimination is based on a perceived disability, unlike the majority of states' definitions.