64 P.3d 691 (2003)
Donald ROEBER, Appellant,
v.
DOWTY AEROSPACE YAKIMA, a Washington corporation, Respondent and Cross-Appellant.
Nos. 21125-8-III, 21149-5-III.
Court of Appeals of Washington, Division 3, Panel Six.
March 11, 2003.
*693 Ryan M. Edgley, Edgley & Beattie, Yakima, WA, for Appellant.
Gary E. Lofland, Yakima, WA, for Respondent.
*692 SCHULTHEIS, J.
Washington's law against discrimination declares it an unfair practice for any employer to discharge an employee because of his or her sensory, mental, or physical disability. RCW 49.60.180(2). Donald Roeber was discharged from employment with Dowty Aerospace Yakima after he was involved in an altercation with another employee. He sued, claiming Dowty terminated him because he suffers from migraine headaches and a depressive disorder. The trial court granted Dowty's motion for summary judgment dismissal of the complaint.
On appeal, Mr. Roeber contends he presented sufficient evidence that (1) his disability was a substantial factor in his termination, or that (2) Dowty failed to accommodate his disability. Dowty cross-appeals the trial court's refusal to impose CR 11 sanctions for filing a frivolous complaint. We find insufficient evidence to establish a prima facie case of disability discrimination, but sufficient merit in Mr. Roeber's claims to preclude sanctions. Consequently, we affirm.

FACTS
Because this is a review of a summary judgment, we consider the evidence in the light most favorable to the nonmoving party. Pulcino v. Fed. Express Corp., 141 Wash.2d 629, 639, 9 P.3d 787 (2000). The following facts represent Mr. Roeber's interpretation of the events leading up to his termination. When appropriate, divergent views are included.
Dowty is a Washington corporation that manufactures component parts for commercial and government aircraft. Mr. Roeber began working for Dowty in August 1980. At the time he was terminated in 1998, he held the position of manufacturing engineering programming specialist. Throughout his employment he received regular promotions and salary increases. His annual reviews indicated that he was a competent, valued employee who generally worked well with others. On the other hand, he often needed improvement in attendance and punctuality, and it was noted that, on occasion, he came across "too strong." Clerk's Papers (CP) at 100. According to Mr. Roeber, his work was stressful and the stress increased from 1997 on, when colleagues quit and the additional workload was placed on the remaining employees. He felt compelled to work over 50 hours per week to meet the company deadlines.
On Saturday, May 16, 1998, Mr. Roeber came to the office to assist with a project that was having problems. He attempted to enter through the "tool crib," an enclosed area with a locked steel mesh door. CP at 391. Because he saw no one there to let him in, he kicked the door a few times. Bruce Garner, the tool crib attendant, arrived and walked past Mr. Roeber to the tool crib window, where he talked to his son, James Garner. Feeling ignored, Mr. Roeber said *694 something like, "`Hey, Bruce, why don't you let me in so I can take care of this problem and go home.'" Id. Bruce Garner opened the door but reportedly said, "`You kick this door again, and I'm going to kick your ass.'" Id.
As Mr. Roeber stepped through the door, Bruce Garner slapped him on the face "hard enough to cause a stinging sensation." CP at 400. (Later, in an affidavit, Mr. Roeber claimed he was slapped "hard enough to bring tears to my eyes and interfere with my vision for a period of time." CP at 392.) Mr. Roeber was "instantly infuriated" and called the police to report an assault. CP at 400. As Mr. Roeber tried to leave the tool crib, Bruce Garner approached him. James Garner stepped between the two men and placed his hand on Mr. Roeber's chest. In response, Mr. Roeber stated something like, "`Don't get in the middle of this or I'll have to take your head off to get you out of the way.'" CP at 401. Mr. Roeber later told his supervisor and the investigating police officer that he was so mad he could have killed Bruce Garner. He acknowledged stating, "`If I had a gun, I would've killed him.'" CP at 146. However, he claimed the statement was merely a figure of speech.[1]
Mr. Roeber was suspended pending an investigation of the incident. Management asked him to submit a written statement of his version of the events. He complied with a letter dated May 26, 1998. In this letter he admitted stating "`I was so mad I could have killed him,'" and "`I'll have to take your head off to get you out of the way.'" CP at 401. However, he denied making a direct threat on anyone's life. He explained that the medication for his depression had not been working during the last couple of weeks and it scared him that he got so mad so quickly. However, he asserted that "this story has evolved way beyond the reality of what actually happened." CP at 402. He also wrote,
I believe that calling the police as a response to any aggravating circumstance is a sensible course of action. I was not "extremely upset" until after Bruce slapped me and I needed an arbitrator to intervene. I still believe that, given the circumstances, it was the right thing to do.
CP at 401-02.
On May 27, 1998, Mr. Roeber met with Human Resources Director Cheryl Dale, Vice-President of Operations Don Johnston, and Manufacturing Engineer Manager Mike Stanley. Although he stated he was surprised and concerned about how quickly his temper flared, Mr. Roeber asserted he handled the situation correctly. He was also surprised that his threats had been taken seriously. On May 29, Ms. Dale sent Mr. Roeber a termination letter. In it she explained that the company considered it unacceptable for an employee to intimidate or fight with a coworker. She further stated that Mr. Roeber's threats of violence had to be taken seriously due to the company's responsibility to provide a safe workplace.
In November 1998, Mr. Roeber filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). He claimed he was discharged due to a mental condition impairing his anger control. The EEOC dismissed this charge, finding no violation of the statutes, but advised Mr. Roeber of his right to file a lawsuit in federal court. Thereafter, Mr. Roeber filed a complaint in the United States District Court Eastern District. He claimed violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12117, and the Washington State law against discrimination, chapter 49.60 RCW. On July 11, 2000, the district court granted Dowty's motion for summary *695 judgment on the ADA claim and dismissed the state law claims without prejudice. His motion for reconsideration was denied and the Ninth Circuit Court of Appeals affirmed.
The current action was filed in the Yakima County Superior Court in May 2001. Mr. Roeber sought lost wages, compensatory damages, attorney fees, and costs for unlawful termination and for Dowty's failure to accommodate his known disability. In particular, Mr. Roeber claimed he was discharged because he suffers migraine headaches and a depressive disorder and/or because Dowty perceived him as handicapped.
According to Mr. Roeber, he first consulted with a mental health counselor in 1988, when he was going through a divorce. At that time, he took an antidepressant for about 10 days. He again sought counseling for depression in September 1992, when he was under substantial stress at work and a coworker recommended treatment for his mood swings. Dowty's Human Resources Director at that time, Bette Taylor, recommended that Mr. Roeber see therapist Gary Hammer, who provided care to Dowty employees as part of an employee assistance program. Mr. Roeber participated in counseling with Mr. Hammer for dysthymia (a depressive disorder) sporadically from September 1992 through mid-February 1995. In mid-April 1994, Mr. Hammer referred Mr. Roeber to nurse-practitioner Terence Walker for antidepressants. Treatment notes by Mr. Walker indicate that the medication seemed to alleviate some of the effects of Mr. Roeber's depression, including his inability to sleep and interact with others.
By 1997, Mr. Roeber was reportedly feeling overwhelmed at work. He asked Mr. Walker to send a letter to Dowty regarding the job stress. The letter, sent to Ms. Taylor on February 7, 1997, stated that Mr. Roeber had done "quite well" on antidepressants, but that he was now feeling extremely overwhelmed by the hours and responsibilities at work. CP at 150. Mr. Walker further stated that Mr. Roeber reported he had talked to his supervisors on several occasions to try to remedy the problems, but that he had not gotten any response. In conclusion, Mr. Walker wrote, "I hope you will be able to assist Don in his efforts to maintain his employment under less stressful conditions." Id. There is no indication in the record that Dowty responded to Mr. Walker's letter or otherwise acted on it.
Mr. Roeber believes that one of the reasons he suffers a depressive disorder is that he is subject to migraine headaches. Since about 1991, he has suffered nearly daily migraines, although they have been controlled by medication since 1994. He claims that he failed to report to work or left work on occasion due to the headaches.
In November 2001, Dowty moved for summary judgment dismissal of Mr. Roeber's claims, asserting that Mr. Roeber failed to present evidence that he has a disability, that accommodation for such disability was medically necessary, or that he was fired for that disability. Dowty's motion was granted on April 12, 2002 and judgment was entered in its favor. This appeal followed.

PRIMA FACIE CASE OF DISABILITY DISCRIMINATION
On review of an order of summary judgment, we conduct the same inquiry as the trial court. Pulcino v. Fed. Express Corp., 141 Wash.2d 629, 639, 9 P.3d 787 (2000). Summary judgment is warranted if the pleadings, depositions, and affidavits, viewed in the light most favorable to the nonmoving party, show no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Id. Mr. Roeber contends summary judgment is inappropriate here because he raised issues of material fact regarding the nature of his disability, Dowty's discriminatory intent in firing him, and Dowty's failure to accommodate his disability.
Washington's law against discrimination, chapter 49.60 RCW, prohibits an employer from discharging any person from employment on the basis of any sensory, mental, or physical disability. RCW 49.60.180(2). An employer who discharges an employee for a discriminatory reason faces a disparate treatment claim, while an employer who fails to accommodate an employee's disability faces an accommodation claim. Pulcino, 141 Wash.2d at 640, 9 P.3d *696 787. Mr. Roeber alleges both disparate treatment and accommodation violations.
I. Disparate Treatment. In a disparate treatment discrimination case, the employee bears the first burden of setting forth a prima facie case of unlawful discrimination. Hill v. BCTI Income Fund-I, 144 Wash.2d 172, 181, 23 P.3d 440 (2001). An employee alleging disability discrimination must establish that he or she (1) is in a protected class (disabled), (2) was discharged, (3) was doing satisfactory work, and (4) was replaced by someone not in the protected class. Chen v. State, 86 Wash.App. 183, 189, 937 P.2d 612 (1997). The employee must present specific and material facts to support each element of this prima facie case. Marquis v. City of Spokane, 130 Wash.2d 97, 105, 922 P.2d 43 (1996). If the employee fails to set forth a prima facie case of discrimination, the employer is entitled to prompt judgment as a matter of law. Hill, 144 Wash.2d at 181, 23 P.3d 440.
Once the employee establishes a prima facie case, a rebuttable presumption of discrimination temporarily takes hold. Id. At this point, the burden shifts to the employer to present sufficient evidence of a legitimate and nondiscriminatory reason for the discharge. Id. If the employer fails to meet this burden of production, the employee is entitled to an order establishing liability as a matter of law. Id. However, if the employer presents sufficient admissible evidence to raise a genuine issue of fact as to whether it discriminated against the employee, the presumption established by the prima facie case is rebutted. Id. at 182, 23 P.3d 440. The employee must then provide evidence that the employer's stated reason for the discharge is in fact pretext. Id.
Whether judgment as a matter of law is appropriate depends on the strength of the employee's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence supporting the employer's case. Id. at 186, 23 P.3d 440. If the record contains reasonable but competing inferences of discrimination and nondiscrimination, the case is properly consigned to a trier of fact. Id. Ultimately the question is whether there is sufficient evidence for a trier of fact to reasonably conclude that discrimination was a substantial factor in the employee's discharge. Id. at 186-87, 23 P.3d 440.
Considering the above, Mr. Roeber's first task in establishing a prima facie case was to present evidence that he has a disability. Pursuant to the regulations adopted under the auspices of the Washington Human Rights Commission, a condition is a disability if it is (1) an abnormality, and (2) is a reason why the person having the condition was discharged. Former WAC 162-22-040(1)(a) (1998) (defining the terms of chapter 49.60 RCW). Recently the Washington Supreme Court rejected the circular nature of this definition as it relates to accommodation cases. Pulcino, 141 Wash.2d at 641, 9 P.3d 787. The problem with the WAC definition is that it requires a factual finding of discrimination because of the condition in order to determine whether a condition is a disability in the first place. Id. at 640, 9 P.3d 787. For the purposes of accommodation claims, Pulcino holds that a disability is a sensory, mental, or physical abnormality that substantially limits the ability to perform the job. Id. at 641-42, 9 P.3d 787. To show such an abnormality, the claimant may present evidence of a condition that is medically cognizable or diagnosable, or that exists as a record or history. Id. at 641, 9 P.3d 787. Although this definition of disability has not been applied to disparate treatment cases, we are convinced that its reasonable terms and consistency with Washington's broad application of the discrimination laws support application here. See id. at 641-42, 9 P.3d 787. See also Hill, 144 Wash.2d at 192 n. 19, 23 P.3d 440 (while noting that there is "no principled reason" why it should be fundamentally harder to establish a prima facie case of failure to accommodate a disability than a prima facie case of disparate treatment, the court had no opportunity to rule that the Pulcino definition should apply in all discrimination cases).
Mr. Roeber established with treatment records that he suffers from migraine headaches and a depressive disorder. Arguably these conditions are abnormalities. See Pulcino, *697 141 Wash.2d at 641, 9 P.3d 787 (an abnormality is a medically cognizable condition); Lindblad v. Boeing Co., 108 Wash. App. 198, 203, 31 P.3d 1 (2001) (recognizing that migraines may be a disability). However, as discussed below in terms of accommodation, Mr. Roeber does not show that these conditions substantially limited his ability to perform his job.
As for the other elements of a prima facie case of disability discrimination, he established that he was discharged and that he did consistently satisfactory work for Dowty. He failed to establish, however, that he was replaced by someone outside his protected class, or that his disability was a reason he was discharged. Although he claimed he trained a person just before he was discharged, he provides no evidence that the person he trained was hired to replace him or that the person was not disabled. Further, he presents no evidence that his medical condition was discussed in any performance reviews or in the investigation that led to his termination. On this record, he does not establish a prima facie case of disparate treatment discrimination.
Further, even if we assume Mr. Roeber carried his initial burden, Dowty presents compelling evidence of a nondiscriminatory explanation for firing him. Its employee handbook states that employees will be disciplined (up to and including suspension or discharge) for "[f]ighting on Company premises, horse-play, or intimidation or coercion of fellow employees." CP at 128. Following the allegations of Mr. Roeber's threatening behavior on May 16, 1998, Dowty management suspended Mr. Roeber and conducted an investigation into the incident. The managers concluded, based on statements from witnesses, Mr. Roeber, and the investigating officer, that Mr. Roeber's actions constituted unacceptable threats of violence against fellow employees.
Mr. Roeber fails to rebut this explanation with probative evidence of pretext. He argues first that his request for accommodation was closely followed by his discharge, raising an inference of a causal relationship. But the only pertinent evidence of a request for accommodation is the 1997 letter from Mr. Roeber's nurse-practitioner, and discharge occurred over a year later after a favorable employment review. Mr. Roeber also contends other employees who demonstrated threatening behavior were treated more favorably. However, two of the three employees who reportedly behaved inappropriately merely yelled in anger or threw a paper tablet against the wall. Three years prior to Mr. Roeber's discharge, an employee was referred to anger management counseling after he threatened to throw a fellow employee's glasses against the wall. Around that time, another employee reportedly threatened to kill a coworker; however, that incident is not contained in the personnel records. Except for the latter case, none of these other incidents rise to the level of threats to kill or to do great violence, and are thus distinguishable from Mr. Roeber's acts. The only incident regarding a threat to kill occurred before the current management was hired, and even that incident did not involve a threat to use a firearm. All together, these incidents do not establish that Dowty had a standard response to threats of extreme violence, or that it deviated from the standard in dealing with Mr. Roeber.
Ultimately, it is not unlawful for an employer to discharge an at-will employee because the employee is perceived to have misbehaved. Hill, 144 Wash.2d at 190 n. 14, 23 P.3d 440. Mr. Roeber does not raise a reasonable inference of pretext. Consequently, Dowty was entitled to judgment on the claim of disparate treatment discrimination as a matter of law. Id. at 186, 23 P.3d 440.
II. Accommodation. To establish a prima facie case of failure to reasonably accommodate a disability, Mr. Roeber must show that (1) he had a sensory, mental, or physical abnormality that substantially limited his ability to perform the job; (2) he was qualified to perform the job; (3) he gave Dowty notice of the abnormality and its substantial limitations; and (4) upon notice, Dowty failed to affirmatively adopt measures available to it and medically necessary to accommodate the abnormality. Hill, 144 *698 Wash.2d at 192-93, 23 P.3d 440; Pulcino, 141 Wash.2d at 641-42, 9 P.3d 787. Mr. Roeber fails to present sufficient evidence that his abnormality substantially limited his ability to perform his job, that he gave Dowty notice of his abnormality's substantial limitations, or that Dowty failed to adopt measures that were medically necessary to accommodate the abnormality.
A. Limitation of Mr. Roeber's ability to perform his job. Although Mr. Roeber's medical records indicate that he suffered from headaches and depression for several years, his employment reviews show consistent satisfactory work with only minor problems in attendance and promptness. His migraines were successfully treated with medication, and he expressed satisfaction with the effects of his antidepressants. Even so, he clearly felt overwhelmed by the stress of deadlines and the long hours expected from management. While this stress had the potential to exacerbate his migraines and depression, the record does not indicate that he was actually substantially limited in his ability to work in his position.
B. Notice of the abnormality's substantial limitation. The 1997 letter from Mr. WalkerMr. Roeber's nurse-practitioner and counselorindicated that Mr. Roeber had been taking antidepressants since 1994 and had "done quite well" under medication. CP at 150. Mr. Walker then explained that Mr. Roeber had recently reported feeling overwhelmed and at his "`wit's end'" due to pressures at work, including his work hours. Id. Mr. Roeber reported that he had tried to talk to his supervisors "to try to remedy the situation," but he felt like he was not getting any response. Id. Mr. Walker concluded with the following statements, "I hope you will be able to assist Don in his efforts to maintain his employment under less stressful conditions. If I can provide you with any additional information, please don't hesitate to contact me." Id.
Even assuming Mr. Roeber had complained to his supervisors as often as he indicated in his affidavit, the record does not show that Dowty was given notice that his migraines and depressive disorder were substantial limitations. The only letter from a medical practitioner indicated that Mr. Roeber's condition was successfully treated with medication. He was never hospitalized or otherwise substantially limited in his ability to perform his job. Although he claims he sometimes missed work or had to leave work due to his headache pain, he also admits his injections of migraine medication usually prevented the headaches from developing or soon brought relief. The record simply does not support his contention that he gave notice to Dowty that he was significantly limited in his ability to perform his job.
C. Medical necessity to accommodate. Mr. Roeber reports that he "told numerous Dowty management personnel," about his migraines and his depressive disorder over the years. CP at 387. He also told them he was taking medication to control these problems.[2] He contends Dowty had a responsibility to take steps to accommodate his limitations. However, he fails to show that accommodation was medically necessary. Mr. Walker's letter did not express an opinion regarding the medical necessity of changing Mr. Roeber's duties. He merely reported what Mr. Roeber had told him about his stress level and asked management to work with Mr. Roeber "to maintain his employment under less stressful conditions." CP at 150. Washington law does not require an employer to provide a disabled employee with accommodations that are not medically necessary. Hill, 144 Wash.2d at 193, 23 P.3d 440.
Additionally, the employee carries the burden of showing that a specific reasonable accommodation was available to the employer when the disability became known. Pulcino, 141 Wash.2d at 643, 9 P.3d 787. Mr. Roeber contends he asked for a demotion or for an off-hours work shift, but he does not indicate whether positions consistent with those requests were available. He shows neither that he was qualified for a vacant position nor that Dowty failed to notify him of job opportunities that would accommodate his *699 alleged disability. Id. at 643-44, 9 P.3d 787; Wilson v. Wenatchee Sch. Dist., 110 Wash. App. 265, 270-71, 40 P.3d 686 (2002).
Generally the question of an employer's reasonable accommodation for an employee's disability is one for the jury. Pulcino, 141 Wash.2d at 644, 9 P.3d 787. However, when the employee fails to establish either that a specific reasonable accommodation was available or that accommodation was medically necessary, the burden of production never shifts to the employer to show that the proposed solution was not feasible. Id. at 643, 9 P.3d 787. In such case, the employer is entitled to judgment as a matter of law. Hill, 144 Wash.2d at 193, 23 P.3d 440. Mr. Roeber fails to establish on the record that specific vacant positions were available at the time he gave notice of his limitations, or that accommodation was medically necessary. Consequently, the trial court correctly adjudicated his accommodation claim as a matter of law. Id.

CR 11 SANCTIONS
Dowty cross-appeals the trial court's refusal to impose CR 11 sanctions, contending Mr. Roeber's attorney failed to conduct a reasonable inquiry into the factual basis for his claims. CR 11 authorizes sanctions when a complaint lacks a factual or legal basis and the attorney who signed the complaint failed to conduct a reasonable inquiry into the factual and legal bases of the claims. Bryant v. Joseph Tree, Inc., 119 Wash.2d 210, 220, 829 P.2d 1099 (1992). We review a trial court's decision regarding CR 11 sanctions for abuse of discretion. Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wash.2d 299, 338, 858 P.2d 1054 (1993). Sanctions may be imposed only if the complaint lacks a factual or legal basis and if the attorney failed to conduct a reasonable inquiry. Bryant, 119 Wash.2d at 220, 829 P.2d 1099. The attorney's reasonableness is evaluated by an objective standard, meaning the court should ask whether a reasonable attorney in similar circumstances could believe his or her actions were factually and legally justified. Id. The fact that the complaint ultimately does not prevail is not dispositive. Id.
In this case, Mr. Roeber raised colorable issues of termination based on discrimination and failure to accommodate a disability. He established a medical abnormality and provided evidence and authority for his belief that Dowty fired him because of that abnormality or because he sought accommodation for that abnormality. His evidence did not establish a prima facie case, but it provided something more than the complete lack of a factual basis. Additionally, his attorney provided legal authority for recovery, if the facts had supported a prima facie case. Although ultimately unsuccessful, his complaint was not totally without basis in law or fact. Accordingly, the trial court did not abuse its discretion in refusing to impose sanctions under CR 11.
Affirmed.
SWEENEY, J., and KURTZ, J., concur.
NOTES
[1] Other witnesses presented a different scenario. According to Bruce and James Garner, Mr. Roeber arrived at the tool crib angry, kicked the door, and yelled while Bruce Garner was assisting his son with a tool. Bruce Garner reportedly thought Mr. Roeber was kidding. Playing along, he mock-threatened to box Mr. Roeber's face if he did not calm down, and tapped him on the cheek. At this point, the Garners claim, Mr. Roeber became extremely angry and James Garner stepped between the two men. James Garner asserts Mr. Roeber told him to "`get out of the way or I'll rip your head off.'" CP at 140. Mr. Roeber's supervisor, who arrived soon after, reports that Mr. Roeber was very angry and stated, "`if I had a gun I'd kill him right now.'" CP at 141. The investigating officer later stated he felt that Mr. Roeber was capable of carrying out his threat and warned against possible retaliation.
[2] Before Mr. Roeber found successful medication for his migraines, the vice-president of manufacturing told him to take breaks whenever he needed to for the headaches.