110 P.3d 782 (2005)
126 Wash.App. 812
Debra CALLAHAN, a married individual, Appellant,
v.
WALLA WALLA HOUSING AUTHORITY, Respondent.
No. 22587-9-III.
Court of Appeals of Washington, Division 3, Panel Three.
April 12, 2005.
*783 Kristian E. Hedine, Virtual In-House Counsel, Walla Walla, WA, for Appellant.
Tom Scribner, Attorney at Law, Walla Walla, WA, for Respondent.
SCHULTHEIS, J.
¶ 1 Soon after Debra Callahan was hired by the Walla Walla Housing Authority (Housing Authority), she began experiencing puzzling physical symptoms that required numerous medical visits and diagnostic tests. *784 Over a couple of months, she was absent 13 times for periods of half an hour to two days. The day she disclosed she was being tested for multiple sclerosis (MS), her employer fired her for excessive absenteeism. Six weeks later, the diagnosis of MS was confirmed. Ms. Callahan sued for, among other things, disability discrimination in violation of the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. The trial court rejected Ms. Callahan's prima facie case and granted the Housing Authority's motion for summary judgment.
¶ 2 Ms. Callahan appeals. The dispositive issues are whether undiagnosed MS is a disability for the purposes of WLAD and, if so, whether it was a substantial factor in her firing. We find that reasonable minds could differ on either issue. Consequently, we reverse the summary judgment and remand for trial.

FACTS
¶ 3 Because this is an appeal of a summary judgment, we consider all evidence and reasonable inferences from the evidence in the light most favorable to Ms. Callahan. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982).
¶ 4 In January 2001, the Housing Authority hired Ms. Callahan as an administrative assistant. Her immediate supervisor was executive director Renée Rooker. The Housing Authority provides compensated time off in the form of personal time off (PTO), instead of designated vacation and sick leave. Employees become eligible for 12 hours per month after their first complete calendar month of service. Ms. Callahan began to accrue PTO as of March 1, 2001.
¶ 5 The Housing Authority personnel policy manual requires employees to schedule time off as far in advance as possible and to fill out a form. The form does not require any explanation for accrued paid time off. The form does have a box for an explanation for unpaid time off. If a medical emergency requires unapproved and unscheduled time off, the employee must call a particular Housing Authority voice mail extension before 7:15 a.m. and leave a message. Proof of illness may be requested for absences lasting more than three days. The manual lists excessive absenteeism and unexcused absences as unacceptable conduct that may result in suspension or discharge.
¶ 6 Toward the end of February 2001, Ms. Callahan began experiencing a variety of health problems. She commenced a series of medical consultations and tests. The trouble started with high blood pressure, which Ms. Callahan discussed with Ms. Rooker. This was followed by back pain, dizziness, weakness of the limbs, and night sweats. Ms. Callahan was absent for all or part of several days in March and April. Each of these absences, whether paid or unpaid, was orally preapproved by Ms. Rooker. Ms. Callahan would then submit the approval form either before or after the fact. Five of the forms request PTO; eight are for unpaid time off. Three of the 13 cite nonmedical reasons. One cites "torn hip muscle." Clerk's Papers (CP) at 51. Three give no reason. All together, Ms. Callahan was absent for 77.5 hours out of 240, or one-third of her scheduled working hours.
¶ 7 On April 2, Ms. Callahan had trouble walking. She went to work anyway, but fell down during the lunch hour and could not get up for half an hour until a fellow employee found her. She did not tell Ms. Rooker about this incident. But Ms. Callahan asserts she talked to Ms. Rooker numerous times about her health problems, specifically on April 6 and April 11, when she discussed with Ms. Rooker her ongoing diagnostic tests.
¶ 8 On Monday, April 16, Ms. Callahan received a memo from Ms. Rooker requesting a doctor's note by the end of the week "per the personnel policy." CP at 59. On that day, Ms. Callahan obtained approval from Ms. Rooker for unpaid leave on April 17 from 8 A.M. to 12 P.M. for a medical test. During the April 17 appointment, Ms. Callahan's primary care provider, physician's assistant Doug West, told her that he was leaning toward MS as a possible diagnosis. He wrote the note for Ms. Rooker: "This Pt. is under our care and is having extensive evaluation for an as of yet undiagnosed condition. Thank you for your patience." CP at *785 58. Mr. West's case notes for April 17 reflect his continuing uncertainty as to the cause of Ms. Callahan's symptoms but that he was leaning toward MS as the most likely culprit. Mr. West sent Ms. Callahan to the hospital for more tests that day and scheduled yet more tests for the following day April 18including magnetic resonance imaging and neurology exams to positively identify MS. The only other diagnosis under consideration was "occult abscesses or other masses." CP at 61.
¶ 9 After leaving Mr. West's office, Ms. Callahan called the Housing Authority. Ms. Rooker was in Yakima all that day. Ms. Callahan left word with the receptionist that she had received bad news about her medical tests and would be absent for the rest of the day. This continued absence into the afternoon had not been preapproved.
¶ 10 The next morning, April 18, Ms. Callahan called in at 7:55 A.M. and spoke to Ms. Rooker. She told Ms. Rooker about the tentative MS diagnosis and that tests were scheduled for that morning to confirm or rule out that diagnosis. She told Ms. Rooker she would report to work at 1 P.M., and that she had obtained the doctor's note Ms. Rooker had requested. Ms. Rooker said, "fine." CP at 86. Ms. Rooker disputes this. In her affidavit, Ms. Rooker says Ms. Callahan simply no-showed, both on the afternoon of the 17th and the morning of the 18th. Ms. Rooker says Ms. Callahan did not speak to the receptionist on the 17th or to Ms. Rooker on the 18th. However, the receptionist's affidavit says Ms. Callahan did call in around noon the day before she was fired and that the receptionist told Ms. Rooker this.
¶ 11 When Ms. Callahan arrived at work at 1 P.M. on the 18th, she found a memo on her desk asking her to report to Ms. Rooker's office, which she did. She handed Ms. Rooker Mr. West's note, but Ms. Rooker put the note aside without reading it. She handed Ms. Callahan a memo terminating her employment immediately without explanation.
¶ 12 In her affidavit, Ms. Rooker explains: "Because of her excessive absences and because she did not call on the afternoon of April 17 to explain her no-show, I decided to terminate her employment. This decision was further strengthened the next day, April 18." CP at 32. Ms. Rooker attests that only after her decision to terminate Ms. Callahan's employment did she learn that "there was even a suspicion that she had MS." CP at 34. Ms. Rooker says Ms. Callahan was good at her job when she was there.
¶ 13 On June 6, Ms. Callahan received a firm diagnosis of MS. She concedes she never asked for reasonable accommodation. But she insists she would have asked for reasonable accommodation to enable her to continue working if she had not been terminated.
¶ 14 On July 25, 2001, Ms. Callahan filed a complaint with the Washington Human Rights Commission, alleging disability discrimination by the Housing Authority. The commission conducted an investigation that included interviews with Ms. Rooker and Ms. Callahan's co-workers. Ultimately the commission found reasonable cause that an unfair employment practice had occurred.
¶ 15 Ms. Callahan then filed this action in the superior court. The Housing Authority moved for summary judgment. At issue was the existence of disputed facts as to (1) whether Ms. Callahan did or did not have a disability for the purposes of chapter 49.60 RCW on the day she was fired and (2) whether the Housing Authority knew or had reason to know of the existence of that disability. Finding that Ms. Callahan failed to establish she was fired because she had MS, the court granted summary judgment and dismissed the complaint.

PRIMA FACIE CASE OF DISABILITY DISCRIMINATION
¶ 16 On appeal, Ms. Callahan contends she produced sufficient evidence to support a prima facie case of disparate treatment discrimination. She asserts that reasonable minds could find from this record that the specter of MS was the actual reason she was fired.
¶ 17 In reviewing an order of summary judgment, this court engages in the same inquiry as the trial court. Roeber v. Dowty Aerospace Yakima, 116 Wash.App. 127, 134, 64 P.3d 691, review denied, 150 *786 Wash.2d 1016, 79 P.3d 446 (2003). Summary judgment is appropriate if the moving party demonstrates the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. CR 56(c); Pulcino v. Fed. Express Corp., 141 Wash.2d 629, 639, 9 P.3d 787 (2000). The party opposing the motion to dismiss must produce specific facts that establish an issue of material fact. Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wash.2d 1, 12-14, 721 P.2d 1 (1986). Speculation and argumentative assertions of unresolved facts will not do. Id. at 13, 721 P.2d 1. Summary judgment is proper if, based on all the evidence, the court is satisfied that reasonable persons could reach only one conclusion. Wilson, 98 Wash.2d at 437, 656 P.2d 1030.
¶ 18 The plaintiff's ultimate burden in employment discrimination cases is to produce enough evidence for a trier of fact to reasonably conclude that discrimination was a substantial factor for the adverse employment action. Hill v. BCTI Income Fund-I, 144 Wash.2d 172, 186-87, 23 P.3d 440 (2001). The court evaluates the strength of the prima facie case and the proof that the employer's explanation is false, and any other evidence supporting the employer's case. Id. at 186, 23 P.3d 440 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148-49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). If the plaintiff fails to establish a prima facie case or to rebut the defendant's alternative explanation for the adverse action, the defendant is entitled to summary judgment. Hill, 144 Wash.2d at 181, 23 P.3d 440. If the evidence could support reasonable inferences either way, the case should go to trial. Id. at 186, 23 P.3d 440.
¶ 19 An employee claiming disparate treatment discrimination bears the initial burden of setting forth a prima facie case. Id. at 181, 23 P.3d 440. The specifics of the prima facie case are suggested by the particular form of discrimination alleged. In general, the plaintiff must produce sufficient evidence to enable a jury to find that the adverse employment action was, more likely than not, the result of unlawful discrimination. Id. at 186-87, 23 P.3d 440; Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir.1995). The elements of a prima facie case of disparate treatment disability discrimination are that the employee was:
. disabled;
. subject to an adverse employment action;
. doing satisfactory work; and
. discharged under circumstances that raise a reasonable inference of unlawful discrimination.[1]
Anica v. Wal-Mart Stores, Inc., 120 Wash. App. 481, 491, 84 P.3d 1231 (2004). Each element must be supported by specific facts. Marquis v. City of Spokane, 130 Wash.2d 97, 105, 922 P.2d 43 (1996).
¶ 20 Here, the parties agree that firing Ms. Callahan was an adverse employment action and that she was doing satisfactory work when she was fired. Consequently, the disputed elements are whether she was disabled and whether she presented sufficient evidence to raise a reasonable inference that her suspected MS was a substantial factor in the decision to fire her.
¶ 21 WLAD prohibits employment discrimination based on real or perceived disability. RCW 49.60.010; Hill, 144 Wash.2d at 191, 23 P.3d 440. Employers may not discriminate against or discharge any employee from employment on the basis of, among other things, the presence of any sensory, mental, or physical disability. RCW 49.60.180. Thus, the first thing an employee alleging disability discrimination must establish is that she is disabled. Roeber, 116 Wash.App. at 136, 64 P.3d 691.
*787 ¶ 22 The question presented here is whether Ms. Callahan's yet-to-be diagnosed condition constituted a WLAD disability on the day she was fired. In defining disability, we do not distinguish between claims based on disparate treatment and those alleging failure to accommodate. Id. We define a disability as a medically cognizable or diagnosable condition that exists as a record or history and that substantially limits the ability to do the job. Roeber, 116 Wash.App. at 136, 64 P.3d 691 (citing Hill, 144 Wash.2d at 192, 23 P.3d 440; Pulcino, 141 Wash.2d at 641, 9 P.3d 787).
¶ 23 Accordingly, we ask whether the term medically "cognizable or diagnosable" means the same as "recognized or diagnosed." On its face, it does not. The fact that a condition has not yet been recognized and diagnosed does not mean it is not susceptible of recognition and diagnosis. Multiple sclerosis is a cognizable and diagnosable condition.
¶ 24 Ms. Callahan also presented sufficient evidence that this condition substantially limited her ability to do her job. The Housing Authority contends she failed to show how MS would substantially limit her ability to do her job in the future. But she was fired for her inability to do her job on that day and the preceding days. Ms. Rooker attested that Ms. Callahan was a good administrative assistant, but that her performance was substantially impaired because of her inability to maintain consistent attendance. It is at least a question of disputed fact whether her illness substantially limited her ability to maintain the required level of attendance.
¶ 25 Ms. Callahan presented sufficient evidence to put to a jury the question of whether her disease disabled her by causing a cluster of unavoidable absences. The fact that the Human Rights Commission found reasonable cause that an unfair employment practice had occurred strongly supports her assertion that reasonable minds might differ on the issue of disability. Phillips v. City of Seattle, 111 Wash.2d 903, 908, 766 P.2d 1099 (1989); Magula v. Benton Franklin Title Co., 131 Wash.2d 171, 178, 930 P.2d 307 (1997).
¶ 26 To establish the second element of the prima facie case, Ms. Callahan had to present sufficient evidence to raise a reasonable inference that the possible diagnosis of MS was a substantial factor in Ms. Rooker's decision to discharge her immediately and without notice.
¶ 27 Contrary to the trial court's ruling, Ms. Callahan presented evidence from which a jury could reasonably find that Ms. Rooker knew about the suspected diagnosis when she fired Ms. Callahan. Ms. Callahan says she called on April 17 and talked to the receptionist because Ms. Rooker was not available. Ms. Rooker alleged that the receptionist told her Ms. Callahan did not call. But the receptionist attests that Ms. Callahan did call and that Ms. Rooker was told she called. Ms. Callahan's version is further corroborated by Ms. Rooker's own affidavit that she was away in Yakima on April 17, making it plausible that Ms. Callahan would talk to the receptionist. A reasonable juror might wonder what happened between the 16th (when proof of illness was requested) and the 18th (when it was provided) to cause Ms. Rooker's sudden loss of interest in the doctor's note. According to Ms. Callahan, what happened was that she called Ms. Rooker on the morning of April 18 with the news that MS was suspected.
¶ 28 Whether Ms. Callahan was fired for failing to observe the letter of the policy manual is also disputed. The record contains several instances from which a jury could infer that the policy manual was not strictly followed. For example, it was the Housing Authority's practice for short absences to be orally approved in advance, with a written request to be submitted sometimes before, sometimes after, the absence. Ms. Rooker testified in her affidavit that she orally preapproved all of Ms. Callahan's absences, except on the day she was fired. Ms. Callahan insists Ms. Rooker approved that absence also. Also, Ms. Callahan readily acceded to Ms. Rooker's request for proof of illness, even though she had not been absent three consecutive days as the manual required. Again, the sudden strict adherence to the letter of the manual would support an inference favorable to Ms. Callahan.
*788 ¶ 29 Considering the evidence in the light most favorable to Ms. Callahan, as we are bound to do, the record raises genuine issues of material fact regarding whether she had a disability that was a substantial factor in her employer's decision to fire her. Because reasonable jurors could reach more than one conclusion from this record, we reverse the summary judgment and remand for trial.

ATTORNEY FEES
¶ 30 Ms. Callahan requests attorney fees on appeal. Attorney fees are awarded to the prevailing party in a discrimination appeal. Xieng v. Peoples Nat'l Bank, 120 Wash.2d 512, 844 P.2d 389 (1993). However, the Housing Authority correctly points out that any award of fees to the prevailing party on an appeal of a summary judgment must await the outcome of the trial on the merits. Hinman v. Yakima Sch. Dist. No. 7, 69 Wash.App. 445, 453, 850 P.2d 536 (1993).
¶ 31 Reversed and remanded.
I CONCUR: BROWN, J.
SWEENEY, A.C.J. (dissenting).
¶ 32 I do not find genuine issues of material fact, at least those supported by substantial evidence, on the two essential questions underlying the court's summary dismissal of this employment discrimination case. First, the current accepted definition of disability is an abnormal condition that substantially limits the employee's ability to do the job. Hill v. BCTI Income Fund-I, 144 Wash.2d 172, 192, 23 P.3d 440 (2001). There is no showing on this record even assuming a diagnosis of multiple sclerosis (MS) (one which was not made at the time of Debra Callahan's firing) that Ms. Callahan was fired for not doing her job. Indeed, it is undisputed that when she showed up for work she was an excellent employee who performed her job without a limitation. The problem was not any disability, real or perceived. The problem was she did not show up for work. And she did not show up for work for a variety of reasons, some related to child care problems, some unexplained, some related to medical problems, but even there many unrelated to any symptoms which could be ascribed to MS.
¶ 33 But even assuming a cognizable or a diagnosable condition which substantially limited her ability to do her job, I do not believe that Ms. Callahan has made a showing beyond speculation that the Walla Walla Housing Authority's facially irrefutable reason for termination (excessive absences) was pretextual. Indeed, even if Ms. Callahan's showing is accepted at face value, it pits secondhand speculationsuspected MS against the confirmed representation by her physician's assistant to Ms. Callahan's supervisor that "[t]his Pt. is under our care and is having extensive evaluation for an as of yet undiagnosed condition. Thank you for your patience." Clerk's Papers at 58. For me, that is not substantial evidence. Perry v. Costco Wholesale, Inc., 123 Wash.App. 783, 792, 98 P.3d 1264 (2004). To conclude, as the court must, that Ms. Callahan's secondhand speculation to her supervisor that she might have MS prompted this discharge is again speculation.
¶ 34 I would affirm the summary dismissal.
NOTES
[1] This court in Roeber, 116 Wash.App. 127, 64 P.3d 691, incorporated the prima facie employment discrimination elements of Chen v. State, 86 Wash.App. 183, 937 P.2d 612 (1997), including a requirement that the plaintiff prove he or she was replaced by a person outside the protected class. Chen, however, addresses age, race, or national origin discrimination, not disability. Chen, 86 Wash.App. at 189, 937 P.2d 612. Replacement by a person outside the protected class is relevant when one member of the class is much like another. But disabilities differ widely. Replacing a plaintiff who has a burdensome disability with a person less inconveniently disabled does not eliminate the possibility that the disability was a substantial factor.