IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ELIZABETH HANCOCK, | ) | |
| | ) | No. 38525-6-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TAE YANG, LLC, a Washington limited | ) | UNPUBLISHED OPINION |
| liability company d/b/a, and, Cave B Inn | ) | |
| & Spa Resort, | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, C.J. — Elizabeth Hancock appeals the summary judgment dismissal

of her disability discrimination claims against her former employer, Tae Yang, LLC. Her

claims were based on Tae Yang's handling of her absenteeism and physical limitations

when she was experiencing the first symptoms of multiple sclerosis. Although there are

disputes over some of what was said and done, Tae Yang argued that essential elements

of Ms. Hancock's claims failed as a matter of law. We agree and affirm.

FACTS AND PROCEDURAL BACKGROUND

Tae Yang, whose primary business is hotel management and event planning,

owned and operated the Cave B Inn and Spa Resort (Cave B) in Quincy from July 2017

until November 2020. Although Cave B offered year-round lodging, its principal source

of revenue was from hosting weddings and other events. At the time Tae Yang acquired

Cave B, the plaintiff, Elizabeth Hancock, was working for the inn and spa as a part-time banquet server and bartender. As a banquet server, Ms. Hancock mainly worked wedding events, setting up tables and food, serving guests, and cleaning up afterward. She was employed at an hourly rate of $13.

In mid-March 2018, Tae Yang promoted Ms. Hancock to event coordinator, a full-time position. She was offered the promotion by M.K. Yi, Cave B's general manager. Ms. Yi described the event coordinator position as responsible for overseeing events, managing employees, and "making sure that everything is set up perfectly and all the guests are happy." Clerk's Papers (CP) at 95. Ms. Hancock described the job similarly, emphasizing the setting up, and testifying, "I was pretty much the contact from the beginning to the end of the events for the customers." CP at 116. As event coordinator, Ms. Hancock's hourly rate increased to $16.

Two months after her promotion, Ms. Hancock worked what her fiancé recalled being an 18-hour shift, at the end of which she was numb from the waist down. Ms. Hancock believes it was on May 16, 2018. When the numbness had not gone away the next day, she began seeing doctors. The only documentation of her appointments in the record is a medical release that reflects treatment she received at the offices of Confluence Health in Wenatchee on May 17 and 24, 2018. She and her fiancé acknowledge there were other appointments and emergency room visits, however. Ms. Hancock testified, "I needed to see a lot of doctors" and "was having a lot of doctors'

appointments." CP at 120. Her fiancé testified, "She was missing a lot of work."
CP at 150.

By Saturday, May 19, 2018, Ms. Hancock had told Ms. Yi and Kelly Johnson, Cave B's sales manager, about her medical concern, because on that day Ms. Hancock was asked to prepare a note affirming she wished to work and was able to work. As sales manager, Ms. Johnson put the banquets together, so she and Ms. Hancock worked together and Ms. Hancock and Ms. Yi both viewed Ms. Johnson as Ms. Hancock's supervisor. While Ms. Johnson perceived Ms. Yi, as general manager, to be Ms. Hancock's supervisor, Ms. Johnson acknowledged that as sales manager, she "oversaw the performance of the events and things like that." CP at 136.

Ms. Johnson recalls the women's discussion on May 19 as being one of two meetings that she and Ms. Yi had with Ms. Hancock to talk about Ms. Hancock's missed work, her condition, her limitations, and how to accommodate them. Both Ms. Johnson and Ms. Yi viewed Ms. Hancock as a good employee. Ms. Yi testified that her reason for wanting the note from Ms. Hancock was "to make sure she is working on her own will . . . so she doesn't complain that I made her work when she was not in good health or she's not able to work." CP at 100-01.

In electronic mail from Ms. Yi to Ms. Hancock the following evening, May 21, Ms. Yi expressed concern about the long hours Ms. Hancock had worked the day before, and stated:

> When are you planning on coming in?  I will need your doctor's note when you c[o]me back to work next time.  I really don't want your condition to get worse by working more hours.  You will know best but since you already took days off due to your illness I really need to have your doctor's note in the file.

CP at 55.  Ms. Hancock's e-mail response on Monday morning, May 21, said she would be in the next day with a doctor's note.

Instead, it was not until sometime after May 24, 2018, that Ms. Hancock brought in the doctor's note Ms. Yi had requested.  It was the medical release reflecting her treatment at Confluence Health, and was unsigned.  But it had otherwise been completed, and stated that Ms. Hancock had been released to work as of May 17, 2018, with the following restrictions: "light duties, with limited weight lifting < 20 lbs.  Standing limited to 1-2 hrs. and requiring rest."  CP at 58.

Ms. Hancock admitted when deposed that the event coordinator position—being "in charge of setting up and the staff and the events"—is a "pretty physically demanding job."  CP at 116.  She testified that as accommodations, she requested "a lot of additional help that included two different leads that took on some of my duties," and requested "that I spend more time on the computer."  CP at 51.  Asked how Ms. Yi and Ms. Johnson responded, Ms. Hancock testified, "I was told that I would . . . get help," and she testified that initially, she did.  CP at 122.

Indeed, Ms. Yi testified that she was concerned that Ms. Hancock not perform any work not authorized by the medical release, and she required other Cave B staff to step in

4

as needed. Ms. Hancock's briefing on appeal misleadingly characterizes this testimony (e.g., CP at 105-06) as meaning it was a simple matter for Cave B to have multiple employees do the work required by the event coordinator position. The evidence demonstrates otherwise.

Ms. Hancock's payroll records reveal that working in the event coordinator position before she began experiencing symptoms of multiple sclerosis—between mid-March and May 12, 2018—she was working from 60 to 96 hours every two-week period. She was averaging approximately 72 hours per two-week period during that time frame.

By contrast, after she began experiencing symptoms, she worked a total of only 29 hours in the two-week period from May 13 to May 26, and a total of only 28 hours in the two weeks from May 27 to June 9.

Ms. Johnson testified that during this time frame, there were "a couple of occasions" when Ms. Hancock failed to place orders for wine and linens needed for weddings, "and the day of the wedding we didn't have the wine and the linens." CP at 134-35. She testified that on the last wedding Ms. Hancock was supposed to work, "she had a doctor's appointment and ended up not showing up for work." CP at 135. Ms. Johnson also testified that during the period of Ms. Hancock's frequent doctors' appointments there were banquet server shifts that were not covered—scheduling that was Ms. Hancock's responsibility. Ms. Yi recalled hearing complaints about Ms. Hancock not being present or available, and banquet employees not knowing where she

was. It was sometime in May that Ms. Johnson spoke to another Cave B employee,

Juni Diaz, about "wine and things like that that needed to be ordered," and had him step

in to serve as banquet coordinator. CP at 137-38.

When Ms. Johnson was asked in deposition whether Ms. Hancock was able to

perform her job duties as event coordinator during this time frame, she answered:

> No[,] because of the physical requirements of the job for event coordinator
> and banquet staff. Both of those require a lot of moving of tables and
> things like that and equipment.

CP at 138. She agreed that other members of staff could perform the physical tasks,

"However, we need everyone on the team because we set up outside and we tear down

from outdoors and bring everything back in. And so everyone is needed for those

physical requirements to help with all of the equipment and everything, especially with

weddings. And so that is a requirement of the position." CP at 138.

Ms. Johnson affirmed that it was in light of these problems that she and Ms. Yi

arrived at the solution of reassigning Ms. Hancock to a reservations position and spoke to

her about it. Ms. Johnson testified that the reservations position would have been a full-

time position but it would pay less than the event coordinator position.

Ms. Hancock admits that within "a few days" of being told she would get help as

needed, she was told that her "position was no longer fitting for the condition [she] was

in." CP at 125. She testified:

Q. And was this due to your performance?

6

Q. A. I think so.

Q. What about your performance was not fitting of the position?

A. Well, I was at the moment taking time for doctors' appointments. I was numb from the waist down, so I had to take breaks, extra breaks. That's all I can think of right now.

Q. Did you miss workdays?

. . . .

A. Not whole days. No. Or I may have. I don't want to be positive on that.

Q. And when Tae Yang allegedly told you that your position was no longer available, what did they—did they offer you another position?

A. The day that I was told that my event coordinator position was no longer fitting, I was told that I could work in reservations.

Q. And is reservations a job that you could do off your feet?

A. Yes.

Q. And would you be allowed to take more breaks during reservations?

A. No. It's still a busy job.

Q. Is it less physically demanding than the events coordinator?

A. Yes.

CP at 125-26. The date of this meeting is not established by the record, but Ms. Hancock confirmed on reviewing payroll records that her last day of work at Cave B was between May 27 and June 9, 2018.

Ms. Hancock's fiancé testified that he arrived home the afternoon of the day she learned of her reassignment and discovered her crying over what she characterized as a demotion. He recalled she had gone to work because she was supposed to host a

wedding, but had been told she could no longer work weddings and would have to answer phones.

According to Tae Yang, Ms. Hancock responded to being told of the reassignment by abandoning her position. On Saturday, June 9, 2018, Ms. Yi sent an e-mail to Ms. Hancock stating, in part, "Perla [the front desk manager] was trying to contact you regarding your work schedule," and, "If you are still interested in working in Reservations please let her know your available dates and hours." CP at 45. On Sunday, June 17, 2018, Ms. Yi sent a further e-mail stating, in part, "I have been trying to contact you last couple of weeks to work out your work schedule," and, "[W]e really need to know your interest in working with us." CP at 44. On Tuesday, June 26, Ms. Yi sent a third e-mail that stated, in part, "Perla and I have been trying to get hold of you to discuss your work schedule," and, "If you have decided not to work with us please let me know as well." CP at 44. This third and last e-mail stated that if Ms. Yi had not heard back by the end of the month, she would assume Ms. Hancock was quitting. She asked Ms. Hancock to let her know if she wished to apply for a continuing medical insurance benefit. All three e-mails were polite, thanked Ms. Hancock, and wished her a nice day.

Ms. Hancock acknowledges that she never responded to any communication from Tae Yang on or after June 9, 2018. She applied for a job at the Wildhorse Campground in Quincy and began working there sometime between June 11 and 17, 2018.

8

Ms. Hancock was diagnosed with multiple sclerosis in June 2018, sometime after her last day of work at Cave B. She worked at Wildhorse Campground for a couple of months and did not seek employment thereafter. When deposed, she testified that she had applied for and was receiving disability payments of $1,100 per month.

In May 2019, Ms. Hancock filed the action below. She alleged violations of chapter 49.60 RCW, Washington's Law Against Discrimination (WLAD), in the form of disparate treatment and a failure to accommodate her physical limitations. She alleged a violation of chapter 49.78 RCW, the Washington Family Leave Act (WFLA), in the form of interference with or retaliation for her exercise of rights under that act.

Following the conduct of discovery, Tae Yang moved for summary judgment. Ms. Hancock responded with evidence that she contended supported prima facie claims of disability-based disparate treatment and failure to accommodate.

The trial court granted Tae Yang's motion and dismissed the complaint. Ms. Hancock appeals.

ANALYSIS

Ms. Hancock contends summary judgment was improperly granted where she presented genuine issues of material fact on her claims that Tae Yang failed to fulfill its duty of reasonable accommodation and that her disability was a substantial factor

motivating her job reassignment, which she contends was an adverse employment action.[1]

The WLAD makes it unlawful for an employer to "discriminate against any person in compensation or in other terms or conditions of employment because of . . . the presence of any sensory, mental, or physical disability." RCW 49.60.180(3). "An employer who fails to accommodate an employee's disability faces an accommodation claim, while an employer who discharges an employee for a discriminatory reason faces a disparate treatment claim." *Becker v. Cashman*, 128 Wn. App. 79, 84, 114 P.3d 1210 (2005) (citing *Roeber v. Dowty Aerospace Yakima*, 116 Wn. App. 127, 135, 64 P.3d 691 (2003)).

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c). We review a trial court's grant of summary judgment de novo, considering the same record as the trial court in the light most favorable to Ms. Hancock as the nonmoving party. *Kries v. WA-SPOK Primary Care,*

---

[1] The trial court dismissed Ms. Hancock's claim under WFLA on the basis that she had not worked for Tae Yang for at least 12 months, and for at least 1,250 hours during the previous 12-month period, which were requirements for qualifying as an "employee" under that act. Former RCW 49.78.020(4)(a) (2009). The dismissal of that claim is not appealed.

*LLC*, 190 Wn. App. 98, 117, 362 P.3d 974 (2015); *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 444, 334 P.3d 541 (2014).

## I.    FAILURE TO ACCOMMODATE

To establish a prima facie case for failure to accommodate a disability, a plaintiff must show that

> "(1) the employee had a sensory, mental, or physical abnormality that substantially limited his or her ability to perform the job; (2) the employee was qualified to perform the essential functions of the job in question; (3) the employee gave the employer notice of the abnormality and its accompanying substantial limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the abnormality."

*Davis v. Microsoft Corp.*, 149 Wn.2d 521, 532, 70 P.3d 126 (2003) (emphasis omitted) (quoting *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 193, 23 P.3d 440 (2001)).

By May 19, 2018, Ms. Hancock had informed Ms. Yi and Ms. Johnson of her medical concern and that she was being tested for multiple sclerosis. She subsequently provided the medical release outlining her doctor's restrictions to light duty, limited weight lifting, limited standing, and rest breaks. She admits that she requested "a lot of additional help that included two different leads that took on some of [her] duties" and the opportunity to "spen[d] more time on the computer." CP at 51.

Employers have an affirmative duty to reasonably accommodate an employee's disability, unless doing so imposes an undue hardship on the employer's business. *Gamble v. City of Seattle*, 6 Wn. App. 2d 883, 889, 431 P.3d 1091 (2018); *Snyder v. Med.*

11

*Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 239, 35 P.3d 1158 (2001). To accommodate, the employer must affirmatively take steps to help the disabled employee to continue working at her existing position or through attempts to find a position compatible with her limitations. *Griffith v. Boise Cascade, Inc.*, 111 Wn. App. 436, 442-43, 45 P.3d 589 (2002) (citing *Doe v. Boeing Co.*, 121 Wn.2d 8, 18, 846 P.2d 531 (1993); *Clarke v. Shoreline Sch. Dist. No. 412*, 106 Wn.2d 102, 120, 720 P.2d 793 (1986)). Washington law "does not require an employer to offer the employee the *precise accommodation he or she requests.*" *Griffith*, 111 Wn. App. at 443 (quoting *Sharpe v. Am. Tel. & Tel. Co.*, 66 F.3d 1045, 1050 (9th Cir. 1995)). For an employer to satisfy its legal obligation, it merely needs to show it provided an accommodation, and that the accommodation was reasonable. *Id.*

Arguably, Ms. Hancock's requested accommodation was unreasonable as a matter of law, since it would require Tae Yang to remove or modify essential functions of the event coordinator position. *Id.* at 444. It would require that two additional employees take over some of her duties; as Tae Yang argues, "unwillingness to pay three people to do one job is certainly legitimate." Br. of Resp't at 31. Ms. Hancock had herself summarized the duties of the event coordinator as being "in charge of setting up and the staff and the events," and serving as "pretty much the contact from the beginning to the end of the events for the customers," yet she proposed to spend most of her time on the computer. CP at 116.

12

"Reassignment is a reasonable accommodation." *Griffith*, 111 Wn. App. at 444

(citing *Pulcino v. Fed. Express Corp.*, 141 Wn.2d 629, 643, 9 P.3d 787 (2000); *Davis v.*

*Microsoft Corp.*, 109 Wn. App. 884, 892, 37 P.3d 333 (2002); *MacSuga v. Spokane*

*County*, 97 Wn. App. 435, 442, 983 P.2d 1167 (1999)). Tae Yang offered Ms. Hancock

full-time employment consistent with the restrictions imposed by her doctor and that

would enable her to spend more time off her feet, as she had requested. Where multiple

potential modes of accommodation exist the employer is entitled to select the mode, the

employee is not. *Frisino v. Seattle Sch. Dist. No. 1*, 160 Wn. App. 765, 779, 249 P.3d

1044 (2011). If the accommodation the employer provided is reasonable, then the

employer satisfied its legal obligation and the inquiry is over. *Griffith*, 111 Wn. App.

at 443.

Ms. Hancock complains in her reply brief that no interactive process took place.

If the attempted accommodation is not adequate, the employer may attempt another mode

of accommodation. *Frisino*, 160 Wn. App. at 779. The employee has a duty to

communicate to the employer whether the accommodation was effective. *Id.* at 783. The

employee must communicate this information while the employer still has an opportunity

to make further attempts at accommodation. *Id.* It was Ms. Hancock who cut off

communication and applied for employment elsewhere after learning of the proposal to

reassign her to reservations. Appealing to the importance of the interactive process does

not avail her. Summary judgment was appropriate.

II.    DISPARATE TREATMENT

To establish a prima facie case of disparate treatment based on disability, a plaintiff must show that she was (1) disabled, (2) subject to an adverse employment action, (3) doing satisfactory work, and (4) subjected to the adverse employment action under circumstances that raise a reasonable inference of discrimination. *Callahan v. Walla Walla Hous. Auth.*, 126 Wn. App. 812, 819-20, 110 P.3d 782 (2005). Each element must be supported by specific facts. *Id.* at 820 (citing *Marquis v. City of Spokane*, 130 Wn.2d 97, 105, 922 P.2d 43 (1996)).

Under the *McDonnell Douglas*[2] burden-shifting approach adopted by Washington courts, a plaintiff's demonstration of a prima facie case creates a rebuttable presumption of discrimination. *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 189 Wn.2d 516, 527, 404 P.3d 464 (2017) (citing *Scrivener*, 181 Wn.2d at 446). The burden shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* (citing *Scrivener*, 181 Wn.2d at 446). If the defendant meets this burden, "the plaintiff must produce sufficient evidence showing that the defendant's alleged nondiscriminatory reason for the adverse employment action was a pretext." *Id.* The employee can also satisfy the pretext prong by showing that although the employer's

---

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer. *Id.*

Here, Tae Wang articulated a legitimate, nondiscriminatory reason for proposing to reassign Ms. Hancock to reservations. Ms. Hancock had notified Tae Wang of health concerns, provided work restrictions imposed by her doctor, had requested the addition of two employees to assist in completing the work responsibilities of her position, and had asked to be allowed to do more work on a computer. It was in assessing how to accommodate these needs that Tae Yang identified reassigning Ms. Hancock to reservations as the best accommodation option.

Most reported Washington cases of employment discrimination based on disability involve issues of reasonable accommodation, not disparate treatment. 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL § 330.32, cmt. at 359 (7th ed. 2019). It makes sense that disputes could arise over how an employer must adjust its employment practices to accommodate an employee's disability. It is more unusual for an employer to be accused of taking adverse action, with discriminatory motive or intent, against a satisfactorily-performing disabled employee.

The plaintiff's ultimate burden is to present evidence of *facts* from which a trier of fact can reasonably conclude that discrimination was a substantial factor for the adverse employment action. *Callahan*, 126 Wn. App. at 819 (citing *Hill*, 144 Wn.2d at 186-87). The facts must be admissible in evidence. CR 56(e); *Grimwood v. Univ. of Puget Sound,*

*Inc.*, 110 Wn.2d 355, 359, 753 P.2d 517 (1988), *abrogated on other grounds by Mikkelsen*, 189 Wn.2d at 528-32. In *Grimwood*, the plaintiff offered as support for an inference of discrimination his belief that discrimination *must* have been the basis for his employer's action because, in the plaintiff's view, the employer's stated reasons were not good ones. The Supreme Court held this does not meet the burden of production. *Id.* at 360-61. *And see Domingo v. Boeing Emps.' Credit Union*, 124 Wn. App. 71, 85, 98 P.3d 1222 (2004), *also abrogated on other grounds by Mikkelsen*, 189 Wn.2d at 528-32 (plaintiff's speculation that "I cannot think of any other reason" for defendant's action did not meet her burden of proving the action was motivated by gender, age, or race (emphasis omitted)).

Case law identifies types of evidence an employee can present to support an inference of discrimination. The employee can demonstrate that the employer's proffered reason is pretextual because facts do not support it, the reason would not have motivated its decision, it was not temporally connected to its action, or it had not been a motivating factor in other, similar employment decisions. *Scrivener*, 181 Wn.2d at 447. Alternatively (and even if the employee cannot prove the employer's reasons are pretextual), the employee can present circumstantial evidence that a discriminatory purpose played a substantial role by presenting, e.g., incriminating statements by the decision-maker, or other decisions by the employer that were adverse to the protected class. *See id.* at 450.

Tae Yang met its burden of presenting facts that support an inference of a nondiscriminatory reason for its reassignment decision. Ms. Hancock has not met her burden of presenting facts that support an inference of a discriminatory motive or intent. Her appellate briefing merely repeats, "Tae Yang does not have a legitimate reason for demoting Hancock," Br. of Appellant at 13; "Tae Yang has presented no legitimate reason for the demotion," *id.* at 15; and "Here, there is no known legitimate reason for the demotion." *Id.* at 16. Absent a competing inference of a discriminatory motivation, summary judgment was appropriate.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Fearing, J.

_____
Pennell, J.

17